IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JON CRAMBLETT,

       Plaintiff,

                                     3:10-CV-54-PK

v.                                      FINDINGS AND
                                      RECOMMENDATION

JOHN McHUGH,

       Defendant.

PAPAK, Magistrate Judge:

       Plaintiff Jon Cramblett filed this action against defendant John McHugh, Secretary of the

Army, on January 15, 2010. Cramblett amended his complaint on December 9, 2010.

       Cramblett is currently employed as a welder at the U.S. Moorings in Portland, Oregon, by

the U.S. Army Corps of Engineers, Northwestern Division (the "Corps"), and has been so

employed since approximately October or November 2005, when he was approximately 56 years

old. Cramblett has applied for numerous better-paying jobs working for the Corps as a welder or

rigger on dam projects, without success. By and through his amended complaint, Cramblett

alleges defendant's liability for age discrimination in violation of the Age Discrimination in

Employment Act of 1967 (the "ADEA"), for retaliation in violation of the ADEA, for

maintaining a hostile, racially discriminatory work environment in violation of Title VII of the

Civil Rights Act of 1964, for retaliatory harassment in violation of the ADEA, and for retaliation

Page 1 - FINDINGS AND RECOMMENDATION

in violation of Title VII.

Now before the court are defendant's motion (#51) for summary judgment and defendant's motion (#82) to strike the opinion testimony of Cramblett's expert witness Terry Armentrout.  I have considered the motions, oral argument on behalf of the parties, and all of the pleadings and papers on file.  For the reasons set forth below, defendant's motion (#82) to strike should be granted, and defendant's motion (#51) for summary judgment should be granted in part and denied in part as discussed below.

## LEGAL STANDARDS

### I.    Motion to Strike Expert Testimony

Federal Evidence Rule 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Broadly speaking, expert opinion is admissible if the expert is qualified and the expert's testimony is both reliable and relevant.  *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Daubert v. Merrell Dow Pharm., Inc.*  ("*Daubert II*"), 43 F.3d 1311, 1315 (9th Cir. 1995) ("The question of admissibility only arises if it is first established that the

individuals whose testimony is being proffered are experts in a particular scientific field").  The

district court must act as a "'gatekeeper,' excluding 'junk science' that does not meet the standards

of reliability required under Rule 702."  *Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 605

(9th Cir. 2002).  The Rule 702 inquiry is flexible, however, and depends on the facts of the

particular case.  *See Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th

Cir. 2002).  Admissibility of expert testimony is a matter for preliminary determination by the

court under Federal Evidence Rule 104(a), and the party offering the evidence bears the burden

of proving admissibility by a preponderance of the evidence.  *See Daubert*, 509 U.S. at 592-593.

The Ninth Circuit views "the admissibility of expert testimony as a subject peculiarly within the

sound discretion of the trial judge, who alone must decide the qualifications of the expert on a

given subject and the extent to which his [or her] opinions may be required."  *United States v.

Chang*, 207 F.3d 1169, 1172 (9th Cir. Cal. 2000) (internal modifications omitted), *quoting

Fineberg v. United States*, 393 F.2d 417, 421 (9th Cir. 1968).

## II.    Motion for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues

exist for trial.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence. *See*, *e.g.*, *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.*

*Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTUAL BACKGROUND[1]

### I.    The Parties

Plaintiff Jon Cramblett was born in April 1949. At age 56, Cramblett was hired by the

Corps to work as a welder at the U.S. Moorings shipyard in Portland, Oregon, for a term of one

year. At the time he began working for the Corps, Cramblett had thirty years of experience

working in the private sector as a welder and mobile equipment operator. In June 2006, the

Corps converted Cramblett from a term employee to a "career conditional" employee based on

his veteran status. Cramblett currently continues in his employment by the Corps as a welder

under those terms.

Cramblett is a veteran of the Vietnam War, and suffers from symptoms of post-traumatic

stress disorder. In 2006, Cramblett's daughter was injured while serving the U.S. military in Iraq,

which apparently triggered an increase in Cramblett's symptoms. In particular, a minor hand

tremor that Cramblett had experienced throughout his adult life became exacerbated following

Cramblett's daughter's injury, potentially impairing in some degree his ability to perform certain

kinds of precision welding.

Defendant John McHugh is the Secretary of the Army.

---

[1] Except where otherwise indicated, the following recitation constitutes my construal of
the evidentiary record in light of the legal standard governing motions for summary judgment
under Federal Civil Procedure Rule 56.

## II.    Material Factual History

In early 2007, Cramblett met LaMar Williams, EEO manager for the Corps's Portland District.  Cramblett advised Williams that he had applied for numerous rigger positions on dam projects over the previous years without success, and inquired regarding the selection process for those positions and regarding the ages of the persons selected for some of the jobs he had applied for.  It appears that Williams may have agreed to find out the ages of the successful job candidates.  At the end of the conversation, Cramblett (a white man) may have volunteered the information that his son-in-law was black.  Williams (a black man) apparently found this awkward, and apparently interpreted the remark as a misguided attempt on Cramblett's part to ingratiate himself with Williams; Williams concedes, however, that he may have misunderstood Cramblett's remark.  Cramblett denies any recollection of having made any such remark, but speculates that if he did so, it might have been intended to help Williams identify Cramblett's son-in-law, also a Corps employee, who may also have wanted to meet with Williams at around that same time.

In February 2007, Cramblett's son-in-law, David Proctor, contacted Williams via email regarding Cramblett's belief that the Corps' failure to hire him for rigger positions was the result of discrimination.  At approximately that same time, Cramblett made a couple of attempts to follow up with Williams on his inquiry regarding the ages of the successful job candidates.  When Cramblett succeeded in reaching Williams by telephone, according to Cramblett's testimony, Williams "lashed out" at him, either for pursuing the inquiry or for having made the remark regarding his son-in-law's race.  In any event, Williams referred Cramblett to Scott Hull, an employee in the Corps' Portland District human resources section (the Civilian Personnel

Advisory Center), for information regarding the rigger selection process.

Cramblett and Hull spoke on the telephone regarding the Corps' selection process in February 2007, following which Hull sent Cramblett an email message containing links to the position descriptions for the jobs Cramblett was interested in. Hull advised Cramblett that he should tailor his résumé to the job descriptions, in particular to list on his résumé all tasks that he had actually performed that were mentioned within the job descriptions. It does not appear that Cramblett took this advice. In addition, either Hull or someone Hull referred Cramblett to, specifically Jim Richards, EEO Officer for the Walla Walla District, further advised Cramblett that he should remove all references to experience that would indicate Cramblett's relatively advanced age. Cramblett expressly refused to take this advice.

In autumn 2007, Cramblett wrote a letter to the Corps's Inspector General requesting an investigation into whether Cramblett was the victim of age discrimination in connection with the hiring decisions discussed below. The Inspector General's office referred Cramblett to the EEO system. Cramblett grieved his allegations of age discrimination, and the Corps denied his grievances. In October 2008, Cramblett lodged formal EEO complaints.

In early November 2008, having been named in Cramblett's EEO charge, Williams approached Cramblett in the workplace (Williams had traveled to the Moorings for unrelated reasons) and had a discussion with him. It is Cramblett's testimony that Williams openly expressed anger at Cramblett over the course of this discussion, and that Cramblett felt "chewed out" afterward. Also over the course of this discussion, Williams apparently asked Cramblett if he was a "trouble-maker."

Later in November 2008, Williams taught an EEO class to the Portland Army Recruiting

Page 6 - FINDINGS AND RECOMMENDATION

Battalion.  Cramblett's daughter was in attendance, although Williams did not become aware of that fact until later.  In the course of the class, without using specific names, Williams used Cramblett's remark to him regarding his son-in-law's race as an example of an employee who was not a team player.  Cramblett's daughter recognized her father in the description.

Following Cramblett's EEO complaints, his co-workers and supervisors at the Moorings (including his supervisor Bobnick) began treating Cramblett differently, criticizing his work unfairly, communicating with him only when necessary, and giving him undesirable work assignments.  Cramblett offers evidence that one of his co-workers was advised by a supervisor that he (the co-worker) was being viewed as a potential "trouble-maker" due to having been seen conversing with Cramblett.  At some time thereafter, Cramblett expressed suicidal thoughts to a co-worker, following which his co-workers were instructed to keep an eye on him and not leave him alone in the workplace.  In addition, Cramblett testified that at around this time he began receiving disparate discipline for minor health and safety infractions that others were permitted to get away with.

In February 2009, Cramblett formally complained to the EEOC regarding Williams' use of Cramblett's interaction with him as an example at the Portland Army Recruiting Battalion EEO class.

Prior to filing his complaints, Cramblett had received uniformly excellent performance reviews.

### A.    October 2007 Bonneville Dam Rigger Vacancy

In October 2007, the Corps announced a vacancy for a rigger position on the Bonneville Dam (the "Bonneville Dam rigger position").  Riggers at Bonneville are required to prepare

heavy objects for movement by cranes or forklifts, and must be capable of analyzing rigging requirements and using rigging equipment to ensure safe transportation of such objects. The selecting official for the Bonneville Dam rigger position was Jerry Carroll, the Bonneville Dam maintenance manager.

In March 2008, Carroll reviewed 18 candidate résumés for the position, including that of Cramblett. Carroll ultimately selected Richard Jackson for the position, with David McMickle as an alternate selection. Carroll declares that Jackson was significantly better qualified for the position than was Cramblett, based on Jackson's four years of experience as a rigger and previous years of experience as a rigger helper and on Cramblett's relative lack of experience in rigging and, in particular, in "more challenging rigger work such as critical lifts." Indeed, Carroll questioned whether Cramblett was minimally qualified for a demanding dam rigger position. Carroll further declares that age was not a factor in his decision, that he did not know Jackson's age at the time he made the decision, and that in the 2007-2008 period he selected five job candidates who were age 57 or older. In March 2008, Cramblett was approximately 58 years old, and Jackson was approximately 27 years old.

### B.    January 2008 McNary Dam Rigger Vacancies

In January 2008, the Corps announced vacancies for two rigger positions on the McNary Dam (the "first McNary Dam rigger positions"). Riggers at McNary Dam are required to prepare heavy objects for movement by cranes or forklifts, and must be capable of performing calculations of load weight, center of gravity, and weight distribution to ensure safe transportation of such objects. The selecting official for the first McNary Dam rigger positions was Willie Prewitt, foreman of the general maintenance crew at McNary.

In May 2008, Prewitt reviewed 17 candidate résumés for the positions, including that of Cramblett.  Prewitt ultimately selected Ty Reed and Daniel Rice for the positions, with Scot Lepinski as an alternate selection.  Prewitt declares that he rated each of the seventeen candidates according to their rigging skills, and ultimately selected Reed and Rice for the positions, based in large part on the fact that they had the highest total ratings of all seventeen candidates.  Prewitt declares that Reed had four years of experience as a rigger, and that while Rice was a welder rather than a rigger, his résumé described significant rigging experience, including the use of cables, chokers, and slings, the calculation of load weights and centers of gravity, and the use of cribbing, hoists, and tag lines to rig loads, and listed a formal rigging certification Rice had received.  Prewitt declares that, by contrast, Cramblett's résumé reflects relatively less rigging experience.  In addition, it is worth noting that while Cramblett's résumé lists a rigging certification, the certification on Cramblett's résumé is undated, and does not indicate what it was based upon.  Prewitt further declares that age was not a factor in his decision, that he did not know any selectee's age at the time he made the decision, and that he has selected several candidate riggers who were over 50 years old at the time of their selection.  In May 2008, Cramblett was approximately 59 years old, Reed was approximately 38 years old, and Rice was approximately 30 years old..

### C.    August 2008 McNary Dam Rigger Vacancy

In August 2008, the Corps announced another vacancy for a rigger position on the McNary Dam the "second McNary Dam rigger position").  The selecting official for the second McNary Dam rigger position was Prewitt.

In October 2008, Prewitt reviewed 23 candidate résumés for the position, including that

of Cramblett.  Prewitt ultimately selected Michael Flowers for the position.  Prewitt declares that

he and two other McNary employees rated each of the seventeen candidates according to their

rigging skills, and that he ultimately selected Flowers for the position, based in large part on the

fact that he had the highest total ratings (summing all raters' ratings) of all the candidates.

Prewitt declares that Flowers had several years of experience as a lineman rigger, with additional

experience as a rigger helper.  Prewitt declares that, by contrast, Cramblett's résumé reflects

relatively less rigging experience.  Prewitt further declares that at the time he made the decision,

he was not aware that Cramblett had made an EEO claim, and that neither age nor the EEO

process were factors in his decision.  Prewitt further declares that he did not know any selectee's

age at the time he made the decision, and that he has selected several candidate riggers who were

over 50 years old at the time of their selection.   In October 2008, Cramblett was approximately

59 years old, and Flowers was approximately 31 years old.

### D.    February 2009 McNary Dam Rigger Vacancy

In February 2009, the Corps announced another vacancy for a rigger position on the

McNary Dam the "third McNary Dam rigger position").  The selecting official for the position

was Prewitt.

In March 2009, Prewitt reviewed 21 candidate résumés for the position, including that of

Cramblett.  Prewitt ultimately selected Stephen Rich for the position, with Christopher Hutton as

an alternate.  Prewitt declares that he and three other McNary employees rated each of the

candidates according to their rigging skills, and that he ultimately selected Rich for the position,

and Hutton as the alternate based in large part on the fact that they had the highest total ratings

(summing all raters' ratings) of all the candidates.  Rich subsequently declined the position,

whereupon it was offered to and accepted by Hutton.

Prewitt declares that Rich had twelve years of experience as a rigger on The Dalles Dam and four years experience as foreman of a rigging crew. Prewitt further declares that Hutton had six years of experience as a rigger at the Puget Sound Naval Shipyard.  Prewitt declares that, by contrast, Cramblett's résumé reflects relatively less rigging experience. Prewitt further declares that neither age nor Cramblett's EEO complaint were factors in his decision. Prewitt further declares that he did not know any selectee's age at the time he made the decision, and that he has selected several candidate riggers who were over 50 years old at the time of their selection.   In March 2009, Cramblett was approximately 59 years old, and Hutton was approximately 54 years old.

### E.    February 2009 The Dalles Dam Rigger Vacancy

In February 2009, the Corps announced a vacancy for a rigger position on The Dalles Dam (the "The Dalles Dam rigger position"). Riggers at The Dalles are required to prepare heavy objects for movement by cranes or forklifts, and must be capable of performing calculations of load weight, center of gravity, and weight distribution to ensure safe transportation of such objects. In addition, riggers at The Dalles are sometimes asked to perform welding tasks. The selecting official for The Dalles Dam rigger position was Arthur Kunigel, the crew supervisor for the structural crew at The Dalles Dam.

In March 2009, Kunigel reviewed candidate résumés for the position, including that of Cramblett. Kunigel ultimately selected Eugene Damm for the position, with Cramblett as an alternate selection. Kunigel declares that he found Damm to be the most qualified candidate for the position because he had over twenty years of experience as a rigger and welder, including

experience as a rigger working with strategic weapons systems and ship repair. Kunigel further declares that Cramblett was also qualified for the position, but that Damm's substantial work experience as a rigger made him the better candidate. Kunigel further declares that age was not a factor in his decision, and that he did not know Damm's age at the time he made the decision. In March 2009, Cramblett was approximately 59 years old, and Damm was approximately 47 years old.

F.    May 2009 The Dalles Dam Welder Vacancy

In May 2009, the Corps announced a vacancy for a welder position on The Dalles Dam (the "The Dalles Dam welder position"). The initial selecting official for The Dalles Dam welder position was Kunigel.

In approximately June 2009, Kunigel reviewed over 70 candidate résumés for the position, including that of Cramblett. Kunigel ultimately selected Robert Scott for the position, and did not identify an alternate selection. Kunigel declares that he found Scott to be the most qualified candidate for the position because he had three years of experience as a welder on the Lower Granite Dam, and over seven years of experience as a welding inspector at Carlson Testing, the body that performs welding inspection at The Dalles Dam. Shortly after Kunigel made that selection, he deployed to Afghanistan and had no further involvement with the inspection process. Kunigel declares that age was not a factor in his decision, and that he did not know Scott's age at the time he made the decision.

Scott ultimately declined the position. Because Kunigel had not identified an alternate candidate, temporary crew supervisor Stephen Rich reviewed the candidates' résumés to make a new selection. Rich declares that he reviewed over 70 candidates' résumés for the welder

position.  Based on candidate skills, experience, and relevant certifications, Rich winnowed the list down to the seven best qualified candidates for the position, among whom was Cramblett. Rich further winnowed the list by three names, based on the specific welding processes and materials the candidates had worked with; Cramblett was among the four remaining candidates. Rich received good reports from all four candidates' supervisors.

Rich interviewed all four remaining candidates, including Cramblett.  Based on those interviews, Rich decided the two best candidates were Kevin Worthington and David Crawford, each of whom Rich interviewed a second time.  In September 2009, Rich ultimately selected Worthington for the position, with Crawford as the first alternate and Cramblett as the second alternate.  Rich declares that Cramblett was not selected for the position because in his interview he described the tremor in his hand that potentially made precision welding tasks somewhat difficult for him, and because Cramblett did not express confidence in his precision welding ability.  By contrast, Rich declares, Worthington had great confidence in his skills, and had a variety of useful heavy welding experience.  Rich declares that at the time he made the decision, he was not aware that Cramblett had made an EEO claim, and that neither age nor the EEO process were factors in his decision.  Rich further declares that he did not know Worthington's age at the time he made the decision.  In September 2009, Cramblett was approximately 60 years old, and Worthington was approximately 38 years old.

## ANALYSIS

## I.   Defendant's Motion to Strike Testimony of Cramblett's Expert Witness Armentrout

Terry Armentrout is Cramblett's rigger/welder qualifications expert, and offers testimony regarding the relative qualifications as a rigger and/or welder of Cramblett and the various

persons selected for job positions to which Cramblett applied.  Specifically, Armentrout opines

that Cramblett was better qualified than each of the candidates actually selected.  Armentrout

worked for the Corps in connection with dams in the Portland District for 30 years.  During that

time, he managed several multi-dam projects, and supervised both riggers and welders.  He

claims personal familiarity with OSHA requirements for riggers, and has personal experience as

a welder.

　　　　As noted above, Federal Rule of Evidence 702 provides that a qualified expert may testify

in the form of an opinion, or otherwise, where the proffered opinion will be helpful to the jury in

deciding a contested issue, is based on sufficient data, is based on reliable principles and/or

methods, and reliably applies such principles to the facts of the case.  *See* Fed. R. Evid. 702.

　　　　In connection with a challenge to the admissibility of proffered expert opinion testimony,

the first determination the court is called upon to make is whether the opining expert is qualified

to testify to the proffered opinion.  *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.  A witness

may be qualified as an expert with respect to a given subject matter, and may offer expert

testimony as to that matter, where the witness has special knowledge, skill, experience, training,

or education within that particular subject area.  *See Werth v. Makita Electric Works, Ltd.*, 950

F.2d 643, 648 (10th Cir. 1991), *citing Petition of Central Kansas Elec. Co-op, Inc.*, 582 P.2d

228, 236 (Kan. 1978).  The fact that a witness may be qualified as an expert with respect to one

given area of inquiry does not imply that the same witness is qualified as an expert with respect

to any other discrete area of inquiry, and qualification as an expert does not authorize the courts

to permit a witness to offer expert testimony within any area of inquiry with respect to which the

witness is not so qualified.  *See Berry v. City of Detroit*, 25 F.3d 1342, 1352 (6th Cir. 1994).

Where a witness' credentials are minimally sufficient to permit the witness to be qualified as an expert, the courts lack discretion to exclude the witness' proffered expert opinion on the grounds that the witness is not the best-qualified expert in the area or that other witnesses had credentials of greater relevance or prestigiousness. *See Pages-Ramirez v. Ramirez-Gonzalez*, 605 F.3d 109, 114, 115-117 (1st Cir. 2010).

Once it is established that a witness is qualified as an expert, the court must determine whether the expert's proffered opinion "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In making this determination, the courts must look to whether the opinion testimony is relevant to the presented evidence or to an issue raised in the action, whether the subject matter in question is within the layman's common knowledge or experience, and whether the expert testimony will tend to usurp the role of the jury in any manner. *See United States v. Hankey*, 203 F.3d 1160, 1168-1169 (9th Cir. 2000). Moreover, "[e]xpert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002).

Even if a qualified expert's testimony is relevant, such testimony is only admissible to the extent it rests on "sufficient facts or data." Fed. R. Evid. 702(b). The facts and data underlying an expert's opinion are insufficient, and the proffered opinion premised thereon inadmissible, where the opinion is rests on assumptions unsupported or belied by the facts in the record. *See McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 806-807 (9th Cir. 1988). If, however, the facts or data relied upon by the expert are minimally sufficient to support the expert's opinion, then questions regarding the nature or quality of the underlying data bear upon the weight to which the opinion is entitled or to the credibility of the expert's opinion, and do not bear upon the question

Page 15 - FINDINGS AND RECOMMENDATION

of admissibility.  *See Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004), *quoting Children's Broad. Corp. v. Walt Disney Co.*, 357 F.3d 860, 865 (8th Cir. 2004) ("The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination").

Expert testimony is likewise admissible only if the opinion expressed is "the product of reliable principles and methods."  Fed. R. Evid. 702(c).  In connection with this reliability requirement, the United States Supreme Court has held that the courts may consider factors including (i) whether the theory underlying the expert's testimony is subject to logical falsifiability, *see Daubert*, 509 U.S. at 593, sometimes referred to as "Popperian" falsifiability, (ii) whether the theory underlying the expert's testimony has in fact been subjected to scientific testing, *see id.*, (iii) whether the theory underlying the expert's testimony has been published and/or subjected to peer review, *see id.* at 593-594, (iv) the known or potential rate of error associated with techniques relied upon by the expert, *see id.* at 594, (v) whether the theory underlying the expert's testimony and/or the techniques relied upon by the expert have achieved general acceptance within the relevant scientific community, *see id.*  The *Daubert* court opined that the inquiry into the reliability of an expert's testimony is necessarily "a flexible one.  Its overarching subject is the scientific validity -- and thus the evidentiary relevance and reliability -- of the principles that underlie a proposed submission.  The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."  *Id.* at 594-595.  The Ninth Circuit has opined as follows:

Establishing that an expert's proffered testimony grows out of pre-litigation

research or that the expert's research has been subjected to peer review are the two principal ways the proponent of expert testimony can show that the evidence satisfies the first prong of Rule 702. Where such evidence is unavailable, the proponent of expert scientific testimony may attempt to satisfy its burden through the testimony of its own experts. For such a showing to be sufficient, the experts must explain precisely how they went about reaching their conclusions and point to some objective source - a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like - to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field. *See United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994) (research must be described "in sufficient detail that the district court [can] determine if the research was scientifically valid").

*Daubert II*, 43 F.3d at 1318-1319 (modification original).

Finally, expert testimony is admissible only to the extent that "the expert has reliably applied [such reliable] principles and methods to the facts of the case." Fed. R. Evid. 702(d). That is, where an expert utilizes but misapplies reliable principles or methods, such misapplication is sufficient grounds for exclusion of the expert's testimony. *See AG of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780 (10th Cir. 2009), *citing Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999). "Moreover, when experts apply methodologies in novel ways, they may arrive at conclusions that result in too great an analytical gap between the data and the opinion proffered to be determined reliable." *Id.* (internal quotation marks omitted), *quoting Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1205 (10th Cir. 2002). "In other words, . . . when experts employ established methods in their usual manner, a district court need not take issue under *Daubert*; however, where established methods are employed in new ways, a district court may require further indications of reliability." *Id.*

Defendant challenges the admissibility of Armentrout's proffered opinion testimony under Rule 702 on the stated grounds that Armentrout is not qualified to offer expert testimony

Page 17 - FINDINGS AND RECOMMENDATION

regarding selection of riggers, that the data Armentrout relied upon in offering his opinion was not reliable, and that Armentrout was not properly disclosed as an expert witness before Cramblett offered his testimony.[2]  I find each of defendant's stated grounds for exclusion of Armentrout's testimony unpersuasive, but nevertheless, for the alternative reasons stated below, agree with defendant's broad assertion that Armentrout's testimony is inadmissible under Rule 702.

As to defendant's argument that Armentrout may not testify as an expert due to Cramblett's failure to disclose him as such, I note that no order has issued setting a deadline for expert witness disclosure in this action, and that no trial date has been set, so that under Federal Civil Procedure Rule 26(a)(2)(D), Cramblett was not under any obligation to have disclosed Armentrout as an expert witness prior to offering Armentrout's opinion testimony in opposition to defendant's motion on April 11, 2012.  Cramblett's failure to make early disclosure of Armentrout's identity does not provide grounds for exclusion of Armentrout's testimony.

As to defendant's argument that Armentrout is unqualified to offer expert opinion regarding the relative qualifications of rigger and/or welder job candidates, I note that Armentrout has significant experience with managing riggers and welders employed to work on dam projects and has specific knowledge of the qualifications riggers and welders must have in order to work on such projects.  Armentrout's special knowledge and experience is sufficient to qualify him as an expert in this area, and the court therefore lacks discretion to exclude his

_____

[2]  In addition – and perhaps primarily – defendant challenges the admissibility of Armentrout's testimony by characterizing Armentrout as a disgruntled former employee of the Corps with an axe to grind vis-à-vis his former employer.  Because that characterization unequivocally goes to the *credibility* of Armentrout's testimony rather than to its *admissibility*, I disregard all of defendant's argument to the extent thereon premised.

testimony on the grounds that other knowledge or experience might be of still greater relevance to Armentrout's proffered testimony.

As to defendant's argument that Armentrout based his opinion testimony on unreliable data, I find no grounds in the record for so concluding. Aside from his own knowledge of relevant job requirements, the only data Armentrout purports to rely upon is the information contained in the résumés submitted by the candidates for the various job positions at issue. Because it is precisely that information – and only that information – that must be considered in determining whether defendant should have understood that it was selecting less qualified candidates for those positions at the time it made its selections, Armentrout's opinion testimony cannot be excluded on the basis of Armentrout's reliance on information contained in candidate résumés.

By contrast, Armentrout's proffered opinion bears significant indicia of unreliable application of principles and/or methods to the material facts (in contravention of Rule 702(d)). Indeed, Armentrout's proffered opinion is peppered with assertions that appear arbitrary and logically unjustified rather than data-driven. For example, Armentrout's expressed opinion that Cramblett had thirty years of rigging experience is based entirely on the following data: a single reference to "rigging loads" as a job duty Cramblett performed in connection with one job he held early in his career, a single reference to "work[ing] with derricks [and] us[ing] hand signals for lifting and moving parts and structures" as a job duty Cramblett performed in connection with a second job, and a statement that his current job duties include "[r]igging [and] 10 [t]on [o]verhead [c]rane work." None of these references, whether considered individually or in the aggregate, suggests that Cramblett had thirty continuous years of experience with rigging.

Page 19 - FINDINGS AND RECOMMENDATION

Similarly, Armentrout's expressed opinion that Cramblett has a demonstrated ability to comply with OSHA requirements is not supported by the line items on Cramblett's résumés. In addition, Armentrout's opinion that the documented rigging experience of the successful candidates for rigging positions is overstated is without support in the candidates' résumés.

Because Armentrout's opinion appears in large and material part to be arbitrary and logically unjustified rather than rationally related to the available material data, I agree with the defendant that it is unreliable. In consequence, defendant's motion to strike should be granted and Armentrout's declaration should be excluded from the record.

## II.    Defendant's Motion for Summary Judgment

### A.    Cramblett's ADEA Claims

As noted above, three of Cramblett's five claims arise under the ADEA. The ADEA provides that personnel actions involving employees of United States military departments who are forty years old or older must be "made free from any discrimination based on age." 29 U.S.C. § 633a(a). ADEA-prohibited disparate treatment occurs where an employee's age actually motivates an employer to treat that employee less favorably than other, younger employees. *See*, *e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000); *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609-610 (1993). The *Reeves* court held that "the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome." *Reeves*, 530 U.S. at 141 (internal modifications and quotation marks omitted), *citing Hazen Paper*, 507 U.S. at 610. "To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009), *citing*

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653-654 (2008).  The Ninth Circuit has held that liability for age discrimination may be found where a supervisory employee without age bias makes the decision to take an adverse action against a plaintiff, but a biased subordinate employee "influenced or was involved in the decision or decisionmaking process."  *Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).

It is the ADEA plaintiff's burden to establish by a preponderance of the evidence (whether direct or circumstantial) that the adverse employment action taken against the plaintiff would not have occurred had the plaintiff been under 40 years old.  *See Gross*, 557 U.S. at 167.  The plaintiff retains this burden of *persuasion* at all stages of prosecuting an ADEA claim.  *See id.*  However, when deciding motions for summary judgment the courts of the Ninth Circuit utilize the *McDonnell Douglas* framework for shifting the burden of *production* between the parties in cases where, as here, plaintiffs rely upon circumstantial evidence in support of their ADEA claim.  *See Shelley v. Geren*, 666 F.3d 599, 607-608 (9th Cir. 2012).  An ADEA plaintiff can therefore survive a defense motion for summary judgment either by producing direct evidence of discrimination sufficient to prove the defendant employer's discriminatory animus without inference or presumption or by producing circumstantial evidence within the framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (U.S. 1973).  The *McDonnell Douglas* framework requires the plaintiff first to make a *prima facie* case of age discrimination by establishing by a preponderance of the evidence that (i) he or she was at least 40 years old as of the date or dates that the failure to hire took place, (ii) he or she was qualified for the employment position at issue, (iii) he or she was not hired for the position, and (iv) a substantially younger candidate whose qualifications were not superior to the plaintiff's was hired

to fill the position.  *See Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272

F.3d 1136, 1140 (9th Cir. 2001), *citing Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th

Cir. 1998); *see also Enlow*, 389 F.3d at 812, 813.  If the plaintiff is able to establish a *prima facie*

case of age discrimination, a presumption of discriminatory intent is created, and the burden of

production shifts to the defendant to rebut that presumption.  *See id.*  If the employer defendant is

able to produce evidence that its decision was made for legitimate, nondiscriminatory reasons,

the burden shifts back to the plaintiff to produce evidence that the employer's proffered reason

was pretextual.  *See id.*

For purposes of the ADEA, the courts of the Ninth Circuit consider one job candidate to

be "substantially younger" than another where the younger of the two is at least ten years younger

than the older.  *See, e.g., Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1209 (9th Cir. 2008) (nine

and one half year difference not sufficiently "stark" to support claim of age discrimination in

violation of the AEDA), *citing O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313

(1996) ("In the age discrimination context. . . an inference [of discriminatory intent] cannot be

drawn from the replacement of one worker with another worker insignificantly younger.");

*Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 893 (7th Cir. 1997) (holding that replacement employees

must be at least ten years younger than their predecessors to justify a presumption of age

discrimination).

In addition to disparate treatment based on age, the ADEA prohibits federal employers

from retaliating against employees for filing complaints of age discrimination.  *See Gomez-Perez*

*v. Potter*, 553 U.S. 474, 477, 479, 479-491 (2008).  To show retaliation under the ADEA, an

employee must show "that (1) []he was engaging in protected activity, (2) the employer subjected

h[im] to an adverse employment decision, and (3) there was a causal link between the protected activity and the employer's action." *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140-41 (9th Cir. 2001). The ADEA "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). To prove a cognizable injury stemming from an employer's retaliatory conduct, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (citations, internal quotation marks omitted). Because actions for retaliation under the ADEA are governed by the same *McDonnell Douglas* burden-shifting framework as governs ADEA disparate treatment claims, *see Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1105 (9th Cir. 2008), by making such a showing the employee makes out a *prima facie* case of ADEA retaliation, causing the burden of production to shift to the employer to rebut the presumption of retaliatory animus, *see Vasquez v. County of Los Angeles*, 349 F.3d 634, 646 (9th Cir. 2003).

When the employer's proffered reason for a challenged hiring decision is that the candidate selected for the job position was more qualified than the complaining rejected candidate, "the question [for the court to determine] is not whether [the ADEA plaintiff] in the abstract had better qualifications than the other candidates. The question is whether the other candidates [we]re more qualified with respect to the criteria that [the employer] actually [relies upon in making its hiring decisions]." *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1285 (9th Cir. 2000), *quoting Cotton v. City of Alameda*, 812 F.2d 1245, 1249 (9th Cir. 1987). Moreover, under such circumstances "the district court must compare the qualifications of [the plaintiff] and

the successful candidates, but only to ferret out discriminatory motives." *Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 602 (9th Cir. 1993).

> The district court must not substitute its own judgment about whether the employment decisions were wise, or even fair, for that of the employer. The closer the qualifications of the candidates, the less weight the court should give to perceived differences in qualifications in deciding whether the proffered explanations were pretextual.

*Id.*[3]

Regarding the allegation that an employer's system for rating job candidates is a cover for age discrimination, the Ninth Circuit has opined as follows:

> While a subjective evaluation system can be used as cover for illegal discrimination, subjective evaluations are not unlawful per se and "their relevance to proof of a discriminatory intent is weak." *Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072, 1075 (9th Cir. 1986). Most of [plaintiff's] criticism of the ratings system centers on his contention that it did not do a good job of evaluating the employees and other methods, such as standardized testing, would have done better. [Plaintiff]'s expert witnesses concluded as much. But this allegation does little to help [plaintiff] establish that [defendant] used a subjective system in order to discriminate against older employees. **That [defendant employer] made unwise business judgments or that it used a faulty evaluation system does not support the inference that [defendant] discriminated on the basis of age.** *See Sharpe v. AT&T Co.*, 66 F.3d 1045, 1050 (9th Cir. 1995) (applying state law); *Cotton v. City of Alameda*, 812 F.2d 1245, 1249 (9th Cir. 1987) ("The ADEA does not make it unlawful for an employer to do a poor job of selecting employees. It merely makes it unlawful to discriminate on the basis of age.").

*Coleman*, 232 F.3d at 1285 (emphasis supplied).

Before bringing an ADEA claim, a plaintiff must first file a charge with the Equal Employment Opportunity Commission (or, where applicable, its state-law equivalent) within 180

---

[3] *Odima* was a Title VII rather than an ADEA action. However, the Ninth Circuit has held that interpretation of one federal employment discrimination statute is applicable to all federal employment discrimination statutes. *See, e.g.*, *Wells v. Clackamas Gastroenterology Assocs., P.C.*, 271 F.3d 903, 904-905 (9th Cir. 2001).

days of the complained-of discrimination or, in a state like Oregon in which the complained-of

discrimination would contravene state law, "within 300 days after the alleged unlawful practice

occurred, or within 30 days after receipt by the individual of notice of termination of proceedings

under State law, whichever is earlier." 29 U.S.C. § 626(d)(1). This notice requirement functions

effectively as a statute of limitations. *See Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667,

674-75 (9th Cir. 1988). Thus, complained-of acts of discrimination occurring in Oregon are not

actionable under the ADEA if they took place more than 300 days prior to the plaintiff's BOLI or

EEOC charge.

1.    **Cramblett's ADEA Disparate Treatment Claim and ADEA Retaliation Claim**

Each count of Cramblett's first two ADEA claims (and first two enumerated claims for

relief) is premised on one of defendant's failures to hire Cramblett to fill the rigger and welder

vacancies he applied for, as discussed above. By and through his first claim for relief, Cramblett

alleges defendant's liability under the ADEA for failing to hire him for any of the six rigger and

welder positions discussed above due to age discrimination. Cramblett's first claim for relief (his

"ADEA disparate treatment claim") was initially brought in seven counts. On June 25, 2010,

Judge Haggerty dismissed the third count of Cramblett's ADEA disparate treatment claim, and

although Cramblett subsequently amended his complaint, he did not remove the dismissed count

from his pleading. Each of the six remaining counts of the claim addresses one of the six failures

to hire detailed above. Specifically, the remaining counts of Cramblett's ADEA disparate

treatment claim and the factual predicates thereof are as follows. Count one is premised on the

May 2008 McNary Dam hiring decisions in which Prewitt ultimately selected Ty Reed and

Page 25 - FINDINGS AND RECOMMENDATION

Daniel Rice for rigger positions. Count two is premised on the March 2008 Bonneville Dam hiring decision in which Carroll ultimately selected Richard Jackson for a rigger position. Count four is premised on the October 2008 McNary Dam hiring decision in which Prewitt ultimately selected Michale Flowers for a rigger position. Count five is premised on the March 2009 McNary Dam hiring decision in which Prewitt ultimately selected Christopher Hutton for a rigger position. Count six is premised on the March 2009 The Dalles Dam hiring decision in which Kunigel ultimately selected Eugene Damm for a rigger position. Count seven is premised on the September 2009 The Dalles Dam hiring decision in which Kunigel and Rich ultimately selected Kevin Worthington for a welder position.

By and through his second claim for relief, Cramblett alleges defendant's liability under the ADEA for failing to hire him for each of those rigger and welder positions discussed above in which the selection decision was made after July 2008, due to retaliation in connection with Cramblett's EEOC complaint. The second claim for relief (Cramblett's "ADEA retaliation claim") is brought in four counts, each one addressing one of the four failures to hire that took place after July 2008. Specifically, the counts and factual predicates thereof are as follows. Count one of the claim is premised on the October 2008 McNary Dam hiring decision, count two is premised on the March 2009 McNary Dam hiring decision, count three is premised on the March 2009 The Dalles Dam hiring decision, and count four is premised on the September 2009 The Dalles Dam hiring decision.

I address each hiring decision, and the claim or claims arising out of it, in turn below.

**a.    Hiring Decisions in Connection with First McNary Dam Rigger Positions (Reed, Rice):  ADEA Disparate Treatment Claim, Count One**

According to the vacancy announcements of January 2008, the Corps was looking for riggers for the McNary Dam to perform the following duties:

> Performs rigging in the installation, maintenance and overhaul of components of hydroelectric dam structures, may include locks, spillway, powerhouse, fishways and appurtenances.  Analyzes rigging requirements, prepares supplies of slings and chokers; determines proper method for fastening slings, hitching on loads, clamping cables and tying ropes to objects.  Inspects equipment and machinery for proper blocking.  Uses standard hand-signals in directing movement of load.  Representative of assignments is the raising, removing and replacing of stop logs wherein crane operator and incumbent, together with another rigger, or a crane grounds signalperson, must work as a team for expeditious and safe accomplishment of the work.  Works from scaffolds and over swift, deep water.  Interprets structural drawings; plans layout for steel structures; perform necessary burning and welding to fabricate/construct miscellaneous metal items.  Performs maintenance on steel structures.

Welding is thus an element of the job duties required of the advertised positions, but is not a major component thereof.  Indeed, Prewitt declares that "the riggers at McNary dam rarely do any welding.  The welder at McNary Dam is part of the mechanical crew, not the general maintenance crew, so the mechanical crew is involved more in welding projects at McNary Dam."

The vacancy announcements indicated that the following qualifications were required for the positions:

> •    Knowledge of the full range of rigging techniques to serve as a full performance journey level rigger.  Ability to plan, layout, assemble and install rigging to move heavy loads in confined areas during unit overhauls without the aid of cranes using multipoint suspension techniques where exact placement of the load is critical to the success of installation as well as the safety of workers in the area.  Knowledge and skill to use and understand standard hand signals to direct movement of load both

manually and with a crane.  Knowledge of safety practices, critical loads, etc. and ability to calculate rigging requirements for all situations related to powerhouse lifts.  Ability to cut, splice, and fit all types of rigging equipment to assure safety and timeliness of movement.

• Experience and training that furnish the knowledges, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade. Ability to use and maintain appropriate tools and equipment. Ability to read, understand, and apply instruction and other materials related to the job.

• Ability to do the work of the position under normal supervision.

• Ability to provide production support services.

• Must be able to stand for long periods of time; or recurring activities such as bending, crouching, stooping, stretching and reaching.

• Work requires standing, stooping, bending, climbing, crawling, and kneeling for extended periods in uncomfortable positions.  Worker may lift and move materials weighing up to 40 pounds and, occasionally heavier items with assistance.

• Experience and training that provide the knowledge, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade.

• Possess and maintain the physical ability to lift and carry up to 45 pounds.

* * *

• Demonstrated work experience that equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of the position, and that is typically in or related to the work of the position to be filled.

According to the résumé Cramblett submitted in support of his application for these positions, Cramblett had substantial, extensive experience as a welder.  As to specific rigger experience, his submitted résumé indicates that in his current job position his job duties include "[r]igging [and] 10 [t]on [o]verhead [c]rane work," that his experiences at Diversified Marine,

Inc., where he worked as a welder from 1994 to 1997, included among numerous welding tasks "work[ing] with derricks [and] us[ing] hand signals for lifting and moving parts and structures, " and that his job duties at Reynolds Metals, where he worked as a mobile equipment operator from 1974 to 1994 and 1997 to 2000, included the duty to "[p]repar[e] and rig[] loads onto trains and trucks." Under the heading "training" Cramblett's submitted résumé indicates that in 1980 he received "Standard Fork-lift training" and "Standard Overhead Crane training" from Reynolds Aluminum. In addition, under the heading "Licenses and Certificates" his résumé indicates that he is a "Journeyman Rigger & Certified Overhead Crane Operator," but no date is given for this certification, nor is the certifying body identified. Cramblett's submitted résumé contains no further suggestion that Cramblett had skills or experience qualifying him for a rigger position. Cramblett was 59 years old at the time the hiring decisions were made.

The résumé that successful candidate Reed submitted for the first McNary Dam rigger positions indicates that at the time he submitted his application he was working specifically as a rigger, and had been doing so for four years. His submitted résumé described his then-current job duties as a rigger as follows:

> Select, install, and use cables, ropes, shackles, beam clamps, strongbacks and other weight handling gear to lift, move, and position heavy loads where exact placement of the load is critical. Use complex multipoint suspension techniques to maneuver over, under, and around obstacles by tilting, dipping and turning the suspended load. Estimates weight and center of gravity of load to be moved. Use complex weight handling equipment: such as chainfalls, grip hoists, chain ratchets, air tuggers, blocks , and tackles. Other duties include the fabrication, installation and repair of standing and running rigging and wire cable or fiber rope articles such as slings, towing bridles, wire rope nets, and other ship and boat rigging and weight handling gear. Use standard hand-signals in directing movement of cranes and movement of the load and plan for clearance and safety factors. Assist in ship docking operations by laying out and handling docking lines and tackles, snubbing lines on cleats or pollards, hauling in lines by

Page 29 - FINDINGS AND RECOMMENDATION

operating capstans, remove and install caissons, remove and install stoplogs, and
performing similar duties.  Work with shipwrights for dock build-ups and for the
positioning of the ship during docking operations.  Works in cramped and
awkward positions while installing rigging in confined spaces.  Stands and walks
for prolonged periods of time and frequently climbs on platforms or other
structures to install rigging and to signal crane operators,  Exposed to industrial
dirt, grease, dust, oil, abrasives, and welding fumes caused by shipboard
equipment, portable tools, and machines.  Wears appropriate safety equipment and
protective clothing.

Under the heading "Training," Reed's submitted résumé indicated the following training in

rigger-specific skills:

> 10/2006 Rigger in Charge, CATI Cranes, 8 hrs
> 09/2005 Crane Rigger, Navy Crane Center, 40 hrs
> 09/2005 CAT 3 Crane Safety, 4 hrs
> 06/2004 Fall Protection, 4 hrs
> 06/2004 3/5 Ton Forklift Operator, 16 hrs
> 05/2004 Crane Signaling and Communication, 4 hrs

Reed was approximately age 38 at the time the hiring decisions were made.

The résumé that successful candidate Rice submitted for the first McNary Dam rigger

positions indicates that Rice, like Cramblett, had extensive experience as a welder.  However, by

contrast with Cramblett's submitted résumé, Rice's submitted résumé indicates that Rice had

significant rigging experience, set forth as follows:

> Rigs components using cable, chain, chokers, and slings.  Calculates load weights
> and centers of gravity.  Manipulates loads using cribbing. hoists, and tag lines.
>
> Trained to work in adverse environments such as field welding, waterborne
> operations, confined spaces, and fall protection required heights.  Ensures safe
> work practices to include risk assessment, rigging inspection, overhead/pedestal
> crane operation and inspection, and proper PPE .

Rice's submitted résumé also indicates that his job duties have included "operat[ing] heavy

equipment such as mobile cranes [and] forklifts."  Rice's submitted résumé additionally indicates

Page 30 - FINDINGS AND RECOMMENDATION

that Rice has received the following relevant certifications:

> Certification - PEDESTAL CRANE (02/22/2007)
> []
> Proficient in use of 10 ton bridge crane, and 20 ton pedestal crane.
>
> Certification - JOURNEYMAN RIGGER (01/15/2007)
> []
> Selects proper chain. strap. rope, and cables for weight of loads.  Calculates
> centers of gravity, and estimated load weights.  Compet[e]nt in proper crane hand
> signals.

Rice was approximately age 30 at the time the hiring decisions were made.

Defendant assumes for purposes of its motion that Cramblett has stated a *prima facie* ADEA disparate treatment claim in connection with the hiring decisions to fill the first McNary Dam rigger positions, but argues that Cramblett cannot show that its proffered reason for selecting Reed and Rice over Cramblett was pretextual, on the ground that the three candidates' résumés effectively speak for themselves to establish that both Reed and Rice had superior rigger qualifications to Cramblett.  Moreover, defendant argues, correctly, that even if Cramblett's rigging experience was more extensive than was indicated on his résumé, that fact, if established, would be irrelevant to the question whether the selections were made on the basis of age-discriminatory animus, since the selecting official's decision was based only on the candidates' résumés as submitted, and not on any extrinsic evidence of candidate qualifications.

Cramblett argues to the contrary.  First, Cramblett contends that the selection process relied upon in connection with the hiring decisions to fill the first McNary Dam rigger positions was inherently discriminatory.  In support of this contention, Cramblett argues that because the process includes a preliminary stage in which résumés reflecting insufficient qualifications for the job positions at issue are weeded out by means of a computerized algorithm, there could be

no explanation other than age-discriminatory animus for the purportedly objective skill-rating

process Prewitt employed for the purpose of ranking the candidates whose résumés he reviewed.

However, the evidence of record does not support Cramblett's argument, in that there is no

indication that the computerized algorithm, which relies upon a simple keyword-matching

process, could in any way have obviated the need for objective analysis and ranking of candidate

skill sets.  The fact that Prewitt utilized both the computerized algorithm and objective skill-

rating does not suggest the existence of age-discriminatory bias.

Cramblett additionally argues that the process permitted age-discriminatory bias because

although the ratings assigned to the candidates' job-related skills are intended to be objective,

they are in fact necessarily subjective.  However, the fact that a rating system may have a

subjective component is not evidence that the system is inherently age-discriminatory.  The

subjective element of the rating system does not provide support for Cramblett's contention that

the selection process was biased against him.  *See Coleman*, 232 F.3d at 1285.

Cramblett also argues that the selection process was inherently discriminatory in that it

permitted Prewitt to solicit and receive candidate ratings from his panel of raters before

providing his own ratings, creating an opportunity to manipulate his ratings so as to produce a

specific desired result.  However, analysis of the evidence of record establishes that all four raters

rated Cramblett's skills below those of Reed, and that three of the four rated Cramblett's skills

below those of Rice.  Moreover, there is no suggestion that Prewitt's ratings for any candidate

were significantly out of line with those provided by any other rater.  The fact that Prewitt had

the opportunity to review other raters' ratings before making his own rating determinations thus

provides no grounds for concluding that the selection process was inherently biased.

Page 32 - FINDINGS AND RECOMMENDATION

Next, Cramblett contends that the defendant unreasonably interpreted the line items on his and the successful candidates' résumés so as to reach the otherwise unjustifiable conclusion that Reed and Rice were better qualified for the rigger positions. In support of this contention, Cramblett argues that defendant unreasonably concluded that Reed and Rice had more experience working with 140-ton cranes than Cramblett, that defendant unreasonably credited Reed with more rigger experience than he actually had, due to the fact that Reed's experience with rigging was as a rigger helper rather than as a journeyman rigger, and was specific to the demands of navy rather than dam rigging, and that defendant failed to credit Cramblett with welding qualifications that were clearly superior to those of either Reed or Rice.

Cramblett's arguments are not persuasive. On the face of the three submitted résumés, Reed and Rice appear to be better qualified for the announced rigger positions than Cramblett by wide margins, Cramblett's caveats notwithstanding. In light of the fact that the successful candidates' résumés patently set forth significantly more indicators of relevant rigging experience than Cramblett's, Cramblett's arguments necessarily fall well short of establishing that defendant's proffered reason for selecting Reed and Rice over Cramblett (namely, the superiority of the successful candidates' relevant qualifications) is pretextual.

Because no evidence of record could support a finding that the process leading to the hiring decisions to fill the first McNary Dam rigger positions was inherently biased in violation of the ADEA, and because no evidence of record could support a finding of age-discriminatory animus in connection with Prewitt's selection of Reed and Rice over Cramblett for the two positions, Cramblett has not met his burden to establish pretext. In consequence, defendant's motion for summary judgment should be granted as to count one of Cramblett's ADEA disparate

Page 33 - FINDINGS AND RECOMMENDATION

treatment claim.

        **b.**      **Hiring Decision in Connection with Bonneville Dam Rigger Position (Jackson):  ADEA Disparate Treatment Claim, Count Two**

According to the vacancy announcement of October 2007, the Corps was looking for a rigger for the Bonneville Dam to perform the following duties:

> Performs rigging to complete structural ironwork, welding, rigging, and the operation of gantry/bridge cranes in connection with installation, maintenance and overhaul of components of a major hydroelectric power project.  Assures materials are on hand and inspects work in progress and upon completion.  Reads and interprets structural drawings, plans layout and steel structures:  either supervises or operates tools incident to the trade.  Does necessary burning, complex rigging and sheet metal mechanic duties.  Analyzes rigging requirements and prepares supplies of slings and chokers, determines the proper methods for fastening slings, hitching on loads, clamping cables and tying ropes to objects.  Inspects equipment and machinery for proper blocking.  Uses standard hand signals in directing movement of cranes and load movement.  Performs maintenance on steel structures, such as powerhouse switching structures, gantry cranes, derricks, mitre gales, stairways, grillage, tainter valves, etc.

Welding is thus an element of the job duties required of the advertised position, but is not a major component thereof.  Indeed, Carroll declares that "[t]he riggers at Bonneville Dam do not do much welding, because Bonneville has two full time welders on the structural crew.  Welding experience is certainly a benefit, but welding experience cannot make up for an absence of rigging experience."

The vacancy announcement indicated that the following qualifications were required for the position:

> •     Trades and Labor:  Must possess or be able to obtain and maintain NWD Crane Operator Class II Certification.  May occasionally operate hoisting equipment such as tuggers, manlifts, and shop, bridge, and gantry cranes.  Knowledge of rigging techniques.  Knowledge and skill to use and understand hand signals. Ability to plan, layout, assemble and install

Page 34 - FINDINGS AND RECOMMENDATION

rigging to move heavy loads in confined areas.  Knowledge of safety practices.  WORKING ENVIRONMENT:  Work requires heavy physical effort, including prolonged periods of standing, climbing ladders, and working in cramped spaces.  Must be able to lift and carry equipment and materials weighing frequently up to,and occasionally over 45 pounds.  Must be able to see with limited visibility as when using welding masks, and have normal depth perception.  WORKING CONDITIONS:  Work is performed both inside and outside the powerhouse.  Indoor work subjects employee to high noise levels and outdoor work is subject to usual climate extremes.  There is danger of cuts, bruises, and burns from equipment operated and falling from ladders and scaffolds.  Employee is subject to the discomfort of wearing required safety equipment such as hard -hats, welding masks or shields, gloves, safety glasses and goggles, safety shoes, respirators and ear plugs as required.  Employee is exposed to welding fumes, acids and solvents normal to the trade.  There is the added danger of drowning when working around swift moving water.  Must wear appropriate safety equipment and protective clothing, and successfully complete and maintain all occupational health requirements.  Must possess or be able to obtain and maintain NWD Crane Operator Class II Certification.  May occasionally operate hoisling equipment such as tuggers, manlifts, and shop, bridge, and gantry cranes.

- Experience and training that furnish the knowledges, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade.  Ability to use and maintain appropriate tools and equipment.  Ability to read, understand, and apply instruction and other materials related to the job.

- Ability to do the work of the position under normal supervision.

- Possess and maintain the physical ability to lift and carry up to 45 pounds.

  * * *

- Demonstrated work experience that equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of the position, and that is typically in or related to the work of the position to be filled.

In support of his application for this position, Cramblett submitted a résumé identical to

the résumé he submitted in support of his application for the first McNary Dam rigger positions,

Page 35 - FINDINGS AND RECOMMENDATION

discussed in detail *supra*.  Cramblett was 59 years old at the time the hiring decision was made.

The résumé that successful candidate Jackson submitted for the Bonneville Dam rigger position indicates that at the time he submitted his application he was working as a rigger mechanic, and had been doing so for four years.  His submitted résumé described his then-current job duties as a rigger mechanic in relevant part as follows:

> . . . Work independently with little or no supervision to plan, layout, assemble, repair, and install complex weight handling gear.  Cut, splice, and fit rigging equipment to assure safety of movement.  Maneuver, tilt, and control loads by tag lines and riggings.  Determine means of moving heavy equipment through narrow openings and in confined spaces.  Estimate sizes, weights, and equipment capabilities.  Plan for clearances and safety factors.  Direct operation of cranes.  Work aloft as necessary.  Estimate weight of objects using math formulas.  Use knowledge of trade theory and up-to-date work practices to implement alternate methods while accomplishing jobs safely, on schedule and in cost effective manner.  Use, test, and perform documentation of weight handling equipment within specifications and guidelines of technical directives.  Calculate weight estimates, center of gravity and weight distribution to determine stress factors/angle computations and plan weight distribution and load maneuvering.  Brace, cushion, and prepare loads as necessary.  Plan, layout, assemble and install rigging to move loads in confined areas during unit overhauls without aid of cranes, using multi-point suspension techniques where exact placement of load is critical to success of installation and safety of workers in area.  Direct work of Rigger Helpers on-site using verbal and hand communication signals.

> . . . Rig and hang scaffolding and staging.  Provide on-the-job training to journeymen, apprentices, helpers, and military personnel.  Demonstrate proper trade techniques and practices, and explain safety precautions to be followed; give instruction in use of layout techniques, power tools, materials, measuring devices, precision instruments, and safety devices.

> Use mobile cranes to lift stop logs over swift water.  Work in caisson powerhouse removing pumps, motors, valves, etc.  Use mobile crane to move/clean/repair trash racks (3,500 lbs.)  Perform on-dock removal of fish curtain.  Operate backhoe, bobcat, 25-ton flatbed truck, 1-25 ton chain fall, 1-9 ton grip hoist, operate capstons, and various smaller equipment including D4 Cat, etc.

> . . . Rig highly sensitive electronic equipment, scopes, masts, antennae, etc.  Perform complex removal lifts including props, shafts, and bearings weighing up

to 132,000 lbs.

> Comprehensive knowledge of characteristics of mobile cranes, bridge, and portal cranes and experience with lifting capacity and boom radius of cranes in use at Bangor pier including mobile crane signaling, inspection, layout, and set up. Extensive knowledge of and experience in rigging and line handling operations and docking and undocking operations.

Prior to beginning work as a rigger mechanic, Jackson's submitted résumé indicates that he previously worked as a rigger helper for approximately three years. The submitted résumé describes Jackson's experience as a rigger helper as follows:

> Performed rigging jobs hanging picks, making bridals, finding center of gravity, drifting machinery through the boats, to be lifted off, using shackles, nylon slings, wire rope pendants, beam clamps, eye bolts, swivel hoist rings, air tuggers, winches, chainfalls, lashing wire, and other miscellaneous rigging gear. Accomplished placement, removal, and repositioning of machinery and structural members of ships, submarines, buildings, heavy equipment and other loads, working in all aspects of ship/submarine dry-docking and repair. Performed rigging loft assignments; machine shop rigging; submarine and surface craft rigging, nuclear and non-nuclear rigging, general shop rigging and special projects. Assisted in rigging operations, worked with cranes, assisted in drydock evolutions including docking of submarines and surface craft. Worked on-board floating vessels, rigging components to and through doors, hatches, and hull cuts. Developed comprehensive knowledge of safe working load limits of rigging gear. Used chaffing gear to protect loads from possible damage and in safe operation of rigging and material movement.

Under the heading "Job Related Training," Jackson's submitted résumé indicated (without specificity) that Jackson had received training in "Basic Rigging; Crane Walker; Crane Signaling and communication; Crane Team Concept; Precision Measurement; . . . Railroad and Weight Handling Equipment Operator; Forklift Operator. . . ." Under the heading "Additional Information" Jackson's submitted résumé indicates *inter alia* that "[a]s team lead for Shaft Removal, [Jackson] led rigging and crane teams of up to five people to accomplish early completion of this portion of shafting critical path work," that he had "[e]xtensive experience

Page 37 - FINDINGS AND RECOMMENDATION

with and knowledge of tools, machines, processes, shop and ship areas, and elements of Rigger trade," and that he is "[t]rained in proper safety procedures for operation of equipment and personal protective equipment (PPE) including use of respiratory apparatus."

Jackson was approximately age 27 at the time the hiring decision was made. As noted above, Carroll declares that he was unaware of Jackson's age at the time the hiring decision was made, but as Cramblett notes, Carroll's declaration to such effect is unconvincing, in that Jackson's résumé lists Jackson's high school graduation date, which constitutes a reasonably reliable proxy for his age. In addition, and also as noted above, Carroll declares that not only were Jackson's qualifications for the rigger position superior to Cramblett's, but also that because Cramblett's submitted résumé indicated "practically no rigging experience," he "did not find Mr. Cramblett to have the necessary rigging skills" for the position.

Defendant assumes for purposes of its motion that Cramblett has stated a *prima facie* ADEA disparate treatment claim in connection with the hiring decision to fill the Bonneville Dam rigger position, but argues that Cramblett cannot show that its proffered reason for selecting Jackson over Cramblett was pretextual, on the ground that the two candidates' résumés effectively speak for themselves to establish that Jackson had superior rigger qualifications to Cramblett. Again, Cramblett contends to the contrary, arguing that his significantly superior welding experience makes him the better-qualified candidate, and that Carroll's declaration regarding Cramblett's lack of necessary rigging skills and regarding Carroll's ignorance of Jackson's age at the time the hiring decision was made is, due to its purportedly patent inaccuracy, evidence of pretext.

Cramblett's arguments are not well taken. On the face of the two candidates' submitted

résumés, Jackson's qualifications for the announced rigger position are superior to Cramblett's by a wide margin, and Cramblett's arguments fall well short of establishing that defendant's proffered justification for its decision to hire Jackson over Cramblett (namely, that Jackson was the better qualified of the two candidates) was pretextual. The record contains no evidence on the basis of which a jury could reasonably infer that defendant was motivated by age-discriminatory animus in selecting Jackson. In consequence, defendant's motion should be granted as to count two of Cramblett's ADEA disparate treatment claim.

        **c.**      **Hiring Decision in Connection with Second McNary Dam Rigger Position (Flowers): ADEA Disparate Treatment Claim, Count Four; ADEA Retaliation Claim, Count One**

According to the vacancy announcement of August 2008, the Corps was looking for a rigger for the McNary Dam to perform the following duties:

> Performs rigging in the installation, maintenance and overhaul of components of hydroelectric dam structures, may include locks, spillway, powerhouse, fishways and appurtenances. Analyzes rigging requirements, prepares supplies of slings and chokers; determines proper method for fastening slings, hitching on loads, clamping cables and tying ropes to objects. Inspects equipment and machinery for proper blocking. Uses standard hand-signals in directing movement of load. Representative of assignments is the raising, removing and replacing of stop logs wherein crane operator and incumbent, together with another rigger, or a crane grounds signalperson, must work as a team for expeditious and safe accomplishment of the work. Works from scaffolds and over swift, deep water. Interprets structural drawings; plans layout for steel structures; perform necessary burning and welding to fabricate/construct miscellaneous metal items. Performs maintenance on steel structures.

Welding is thus an element of the job duties required of the advertised position, but is not a major component thereof. Indeed, as noted above, Prewitt declares that "the riggers at McNary dam rarely do any welding. The welder at McNary Dam is part of the mechanical crew, not the general maintenance crew, so the mechanical crew is involved more in welding projects at

McNary Dam."

The vacancy announcement indicated that the following qualifications were required for

the position:

- Knowledge of the full range of rigging techniques to serve as a full performance journey level rigger.  Ability to plan, layout, assemble and install rigging to move heavy loads in confined areas during unit overhauls without the aid of cranes using multipoint suspension techniques where exact placement of the load is critical to the success of installation as well as the safety of workers in the area.  Knowledge and skill to use and understand standard hand signals to direct movement of load both manually and with a crane.  Knowledge of safety practices, critical loads, etc. and ability to calculate rigging requirements for all situations related to powerhouse lifts.  Ability to cut, splice, and fit all types of rigging equipment to assure safety and timeliness of movement.  PHYSICAL EFFORT:  Work requires heavy physical effort, including prolonged periods of standing, climbing ladders, and working in cramped spaces.  Must be able to lift and carry equipment and materials weighing frequently up to, and occasionally over 45 pounds.  Must be able to see with limited visibility as when using welding masks, and have normal depth perception.  WORKING CONDITIONS:  Work is performed both inside and outside the powerhouse.  Indoor work subjects employee to high noise levels and outdoor work is subject to usual climate extremes.  There is danger of cuts, bruises, and burns from equipment operated and falling from ladders and scaffolds.  Employee is subject to the discomfort of wearing required safety equipment such as hard-hats, welding masks or shields, gloves, safety glasses and goggles, safety shoes, respirators and ear plugs as required.  Employee is exposed to welding fumes, acids and solvents normal to the trade.  There is the added danger of drowning when working around swift moving water.  Must wear appropriate safety equipment and protective clothing, and successfully complete and maintain all occupational health requirements.  May occasionally operate hoisting equipment such as tuggers, manlifts, and shop, bridge, and gantry cranes.  CONDITION OF EMPLOYMENT:  Must possess or be able to obtain and maintain NWD Crane Operator Class II Certification.

- Experience and training that furnish the knowledges, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade. Ability to use and maintain appropriate tools and equipment. Ability to read, understand, and apply instruction and other materials related to the job.

- Ability to do the work of the position under normal supervision.

In support of his application for this position, Cramblett submitted a résumé identical to the résumé he submitted in support of his application for the first McNary Dam rigger positions, discussed in detail *supra*. Cramblett was 59 years old at the time the hiring decision was made.

The résumé that successful candidate Flowers submitted for the second Mcnary Dam rigger position indicates that he had worked for approximately one year as a lineman, in which position his job duties included "Light and heavy Rigging of Power / Communications poles, Vaults, Cables/ Cable Reels, Power Tools, Man lifts while acting as Rigger / Riggers helper." Prior to working as a lineman, Flowers' submitted résumé indicates that he worked for one additional year as an apprentice lineman for the Bonneville Power Administration, where his experience included:

> rigging wire rope slings, shackles, synthetic rigging slings chokers, proper blocking for machinery, and other associated rigging equipment, also performed duties as Rigger and Signalperson and used standard hand signals to direct movement to assist crane operator. . . . Worked as rigger for helicopter during spacer change out operations both on the ground and in up to 250 feet steel tower.

Under the heading "Education," Flowers' submitted résumé indicates that Flowers had received "apprenticeship training" from the Bonneville Power Administration in June 2007 in "basic rigging, advanced rigging, forklift certification, bucket truck certification, and completed 1st year Joint Apprenticeship Training Committee lineman apprentice training." In addition, the résumé indicates that Flowers attended a three-month course at the Spokane Community College / Avista Lineman School which included "basic rigging." Finally, Flowers' submitted résumé indicates that Flowers had received a certification in "rigging and equipment" from Industrial

Training International in 2006, covering "Forklift, Bucket Truck, and Rigging," and an additional certification in 2007 following a "JATC Education Course" covering "Wood poles, steel tower, rigging, and related training."  Flowers was approximately age 31 at the time the hiring decision was made.

### i.        ADEA Disparate Treatment Claim, Count Four

Defendant assumes for purposes of its motion that Cramblett has stated a *prima facie* ADEA disparate treatment claim in connection with the hiring decision to fill the second McNary Dam rigger position, but argues that Cramblett cannot show that its proffered reason for selecting Flowers over Cramblett was pretextual, on the ground that the two candidates' résumés effectively speak for themselves to establish that Flowers had superior rigger qualifications to Cramblett.  Again, Cramblett contends to the contrary.

First, Cramblett argues that discriminatory animus can be inferred from the close proximity in time between the decision to select Flowers and Cramblett's EEOC filing, each of which occurred in October 2008 (although the hiring decision was not implemented until approximately December 2008).  This argument is incoherent, however, because while a *retaliatory* animus might arguably be inferrable from such temporal proximity, an *age-discriminatory* animus, as a matter of logic, cannot.

Second, Cramblett argues that Prewitt's discriminatory animus is established by the fact that two of Prewitt's "top six" ranked candidates were not in the "top group" of candidates based on the automated word-match algorithm described above.  This argument is likewise unpersuasive, because, as discussed above, the algorithm was not intended to be useful in ranking qualified candidates, or to obviate the need for such ranking by human decisionmakers, but rather

Page 42 - FINDINGS AND RECOMMENDATION

was intended only to exclude from consideration the résumés of clearly unqualified candidates, a binary rather than an ordinal distinction.

Third, Cramblett argues that abnormalities in the selection process indicate the defendant's age-discriminatory bias, including the fact that a relatively inexperienced rater (Rice) was involved in the selection process, and that Prewitt inititally "concealed" this fact.  In addition, Cramblett argues that Prewitt's ratings for Flowers are out of line with ratings provided by other raters on the selection panel, and argues that Prewitt may be inferred to have inflated Flowers' rankings in order to make his qualifications appear superior to Cramblett's.  I find that neither purported "abnormality" supports the conclusion that defendant's proffered reason for selecting Flowers was pretextual.  Rice's arguable relative inexperience does not suggest anything untoward about the process, and nothing in the record suggests either that Prewitt could have had any untoward motive for "concealing" his involvement or that Prewitt's initial failure to identify Rice as one of the raters on the panel stemmed from anything more troubling than simple oversight.  Moreover, while Prewit's ratings appear not to have closely tracked the other raters' ratings for Flowers, analysis of the available ratings does not suggest that the raters other than Prewitt favored Cramblett for the position, or that if Prewitt's ratings had been excluded from consideration, that Cramblett would have been the highest-rated candidate.  In consequence, age-discriminatory animus cannot properly be inferred from the purported discrepancies.

Finally, Cramblett takes the position that it is clear from the face of the two candidates' résumés that Cramblett had superior qualifications as a rigger.  However, analysis of the two candidates' submitted résumés establishes to the contrary.  While Flowers' rigging experience was not vastly more extensive than Cramblett's, Flowers' résumé emphasized such rigging

experience as he had gained from the job positions he had held, and described in some detail the rigging training he had received and the kinds of rigging problems he had experience solving. By contrast, Cramblett's submitted résumé suggests that Cramblett had, at most, slight or peripheral experience with solving complex rigging problems. Cramblett's arguments therefore fall short of establishing that defendant's explanation was pretextual.

Because a finder of fact could not reasonably conclude on the basis of the evidence of record that Flowers' selection was motivated by age-discriminatory animus, defendant's motion should be granted as to count four of Cramblett's ADEA disparate treatment claim.

### ii.    ADEA Retaliation Claim, Count One

Defendant takes the position that, although it is undisputed that Cramblett engaged in protected activity (filing his EEO charge of October 2008) and that Cramblett was not selected in that same month to fill the second McNary Dam rigger position, Cramblett cannot state a *prima facie* ADEA retaliation claim in connection with that hiring decision, on the asserted ground that no selection official involved in the selection of Flowers was aware of Cramblett's EEOC charge or related complaints at the time the decision was made. In support of this argument, defendant points to the declarations of the selection officials involved in the decision, each of whom declares that he or she knew nothing about Cramblett's age discrimination complaints in October 2008. For his part, Cramblett argues that the close proximity in time between the EEO charge and the adverse hiring decision is sufficient to permit the inference that the two events were causally connected.

Assuming *arguendo* that Cramblett's evidence is sufficient to make out a *prima facie* claim, for the same reasons adduced immediately above, Cramblett has not offered evidence

Page 44 - FINDINGS AND RECOMMENDATION

sufficient to create a question of fact as to whether defendant's proffered nondiscriminatory

reason for its hiring decision was pretextual.  On the face of the two candidates' submitted

résumés, Flowers' qualifications for the rigger position appear superior to Cramblett's.  In

consequence, defendant's motion should be granted as to count one of Cramblett's ADEA

retaliation claim.

> **d.    Hiring Decision in Connection with Third McNary Dam Rigger Position (Hutton):  ADEA Disparate Treatment Claim, Count Five; ADEA Retaliation Claim, Count Two**

According to the vacancy announcement of February 2009, the Corps was looking for a

rigger for the McNary Dam to perform the following duties:

> Performs rigging in the installation, maintenance and overhaul of components of hydroelectric dam structures, may include locks, spillway, powerhouse, fishways and appurtenances.  Analyzes rigging requirements, prepares supplies of slings and chokers; determines proper method for fastening slings, hitching on loads, clamping cables and tying ropes to objects.  Inspects equipment and machinery for proper blocking.  Uses standard hand-signals in directing movement of load.  Representative of assignments is the raising, removing and replacing of stop logs wherein crane operator and incumbent, together with another rigger, or a crane grounds signalperson, must work as a team for expeditious and safe accomplishment of the work.  Works from scaffolds and over swift, deep water.  Interprets structural drawings; plans layout for steel structures; perform necessary burning and welding to fabricate/construct miscellaneous metal items.  Performs maintenance on steel structures.

As noted previously, welding is thus a component of a rigger's job duties at McNary, but not a

major component.

The vacancy announcement indicated that the following qualifications were required for

the position:

> •    Knowledge of the full range of rigging techniques to serve as a full performance journey level rigger.  Ability to plan, layout, assemble and install rigging to move heavy loads in confined areas during unit overhauls

without the aid of cranes using multipoint suspension techniques where exact placement of the load is critical to the success of installation as well as the safety of workers in the area.  Knowledge and skill to use and understand standard hand signals to direct movement of load both manually and with a crane.  Knowledge of safety practices, critical loads, etc. and ability to calculate rigging requirements for all situations related to powerhouse lifts.  Ability to cut, splice, and fit all types of rigging equipment to assure safety and timeliness of movement.  PHYSICAL EFFORT:  Work requires heavy physical effort, including prolonged periods of standing, climbing ladders, and working in cramped spaces. Must be able to lift and carry equipment and materials weighing frequently up to, and occasionally over 45 pounds.  Must be able to see with limited visibility as when using welding masks, and have normal depth perception. WORKING CONDITIONS:  Work is performed both inside and outside the powerhouse.  Indoor work subjects employee to high noise levels and outdoor work is subject to usual climate extremes.  There is danger of cuts, bruises, and burns from equipment operated and falling from ladders and scaffolds.  Employee is subject to the discomfort of wearing required safety equipment such as hard-hats, welding masks or shields, gloves, safety glasses and goggles, safety shoes, respirators and ear plugs as required.  Employee is exposed to welding fumes, acids and solvents normal to the trade.  There is the added danger of drowning when working around swift moving water.  Must wear appropriate safety equipment and protective clothing, and successfully complete and maintain all occupational health requirements.  May occasionally operate hoisting equipment such as tuggers, manlifts, and shop, bridge, and gantry cranes. CONDITION OF EMPLOYMENT:  Must possess or be able to obtain and maintain NWD Crane Operator Class II Certification.

• Experience and training that furnish the knowledges, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade. Ability to use and maintain appropriate tools and equipment. Ability to read, understand, and apply instruction and other materials related to the job.

• Ability to do the work of the position under normal supervision.

According to the résumé Cramblett submitted in support of his application for the position, Cramblett had substantial, extensive experience as a welder.  As to specific rigger experience, his submitted résumé indicates that in his current job position his job duties include

Page 46 - FINDINGS AND RECOMMENDATION

"[r]igging [and] 10 [t]on [o]verhead [c]rane work, including inspecting synthetic slings, wire rope, cables and other fasteners used in the process of lifting, turning or rolling a given part to be worked on" and that he is "skilled on Hand signals," that his experiences at Diversified Marine, Inc., where he worked as a welder from 1994 to 1997, included among numerous welding tasks "work[ing] with derricks [and] us[ing] hand signals for lifting and moving parts and structures, " and that his job duties at Reynolds Metals, where he worked as a mobile equipment operator from 1974 to 1994 and 1997 to 2000, included the duty to "[p]repar[e] and rig[] loads onto trains and trucks."  Under the heading "training" Cramblett's submitted résumé indicates that in 1980 he received "Standard Fork-lift training" and "Standard Overhead Crane training" from Reynolds Aluminum.  In addition, under the heading "Licenses and Certificates" his résumé indicates that he is a "Journeyman Rigger & Certified Overhead Crane Operator," but no date is given for this certification, nor is the certifying body identified.  This résumé differs from that submitted in support of his application for the three earlier-announced job openings discussed *supra* only in the slightly expanded discussion of Cramblett's rigging experience in connection with his current job, set forth above.  Cramblett was 60 years old at the time the hiring decision was made.

The résumé that successful candidate Hutton submitted for the rigger position announced at McNary in February 2009 indicates that at the time he applied, he was working at the Puget Sound Naval Shipyard as a "Rigger Journeyman," and had been doing so for approximately seven years.  The submitted résumé describes Hutton's experience in that position as follows:

> As lead mechanic for crews of five to six employees, instruct Riggers while performing and directing removal, installation, relocation, and handling of large structural parts on naval vessels.  Consider skills required and personnel, material, specifications, and equipment available.  Instruct crew on work requirements, methods and procedures.  Inspect work in progress and at completion.  Make

changes to work plans, work assignments, and methods to control costs and meet schedules. Qualified RIC (Rigger in Charge). Perform all phases of work without supervision unless required by shop policy. Nuclear RAD Qualified. Completed and maintain all academic and practical certifications required to perform nuclear refueling, defueling and regularly scheduled nuclear maintenance on naval vessels.

Plan, layout, assemble, repair, and install complex weight handling gear. Estimate weight of objects us'ing math formulas. Use knowledge of trade theory and up-to-date work practices to implement alternate methods while accomplishing jobs safely, on schedule and in cost effective manner. Use, test, and perform documentation of weight handling equipment within specifications and guidelines of directives. Select rigging gear. Calculate weight estimates, center of gravity and weight distribution to determine stress factors/angle computations and plan weight distribution and load maneuvering. Brace, cushion, and prepared loads. Maneuver, tilt, and control loads with tag lines and riggings. Determine how to move heavy equipment through narrow openings and in confined spaces. Estimate sizes, weights, and equipment capabilities. Plan for clearances and safety factors. Direct portal, mobile and bridge cranes with hand signals, high-powered radios, and sound-powered phones. Work aloft as necessary.

Use chainfalls and chain ratchets to remove and install components and equipment. Use turnbuckles and/or chain binders as tightening devices in securing objects. Apply wire rope to lash loads and use nylon slings where wire rope would damage load. Use deck winches, often in pairs, to hoist large volumes of material and equipment, and air or electric hoists mounted to overhead for same purpose. Use jacks and jackstands to raise and support loads when overhead cannot be used. Use lashing rings, shackles, wire rope pendants and lashing wire to drift loads. Use grommets and round nylon slings to hang loads on large or "T" shaped crane hooks. Use dynometers and load cells to measure weights in order to prevent overloading tools and equipment. Operate MHE (forklifts).

Complete paperwork including Operational Daily Check List, Crane-Related Deficiency Reports, Risk Mitigation Forms, Pre-Job Briefings, Refueling Technical Work Documents, Drawings , Blueprints and Shop Safety Memorandums. Work verbatim compliance according to nuclear and non-nuclear engineering work documents. Qualified to operate Category 2 Pendant-controlled Cranes inside refueling complexes. Special qualification to work with fuel transfer teams on refueling and defueling projects, including safe transfer of fuel handling containers via portal crane and in-house cranes within confines of refueling complex and reactor compartments.

   . . . Read, interpret and apply instructions, references, procedures, blueprints and

shop sketches as they apply to rigging/staging procedures.  Rig and hang
scaffolding and staging.

Hutton's submitted résumé further indicates that Hutton "performed rigging duties" when he

worked for Homes Mechanical from 1997 to 2000.  Prior to that position, Hutton's submitted

résumé indicates that Hutton worked as a "Rigger Journeyman" at the Trident Refit Facility from

1989 to 1997.  Hutton's job duties in that position are set forth as follows:

> As lead mechanic, worked without supervlslon and instructed and mentored
> others in Rigger trade.  Performed and directed placement. removal and
> repositioning of delicate electronic instruments to large structural parts of Naval
> vessels.  Loaded and off-loaded explosive ordnances.  Estimated weight and
> center of gravity of load to be moved.  Planned weight distribution and load
> maneuvering.  Braced, cushioned and otherwise prepared load.  Maneuvered,
> tilted and controlled load as necessary by means of tag lines and riggings.
> Installed beam clamps in conjunction with steel wedges, wooden wedges and
> other clamps to prevent slippage and overloading of clamp and beam.  Exercised
> judgment in selection of lift materials. using as criteria size, weight and center of
> gravity of item to be moved.  Ensured chafing gear, hold-backs and other safety
> precautions were taken.  Used correct lashing techniques and kept loads within
> safe working limits.  Measured correctly before attempting to drift loads through
> complex accesses.  Used dynometers and load cells to determine weights and
> testing. padeyes, chainfalls. pendants. shackles, beam clamps and chain ratchets.
> Inspected gear and materials on daily basis.  Removed and replaced anchors and
> chain, periscopes, snorkles, masts, rudders, rudde r rams. shafts, propellers,
> control panels, computers, bearing halves, bearing covers, hydraulic and air
> system components, pumps and motors, and electronic equipment.  Pulled flood
> gates, repositioned caissons, handled mooring lines and operated capstons.
> Participated in all facets of docking and undocking.  Operated forklifts, log
> broncs, bob cats, JLG lifts.
>
> Performed work in accordance with all governing safety regulations and utilized
> personal protective equipment (PPE) including safety glasses. ear plugs , steel-
> toed boots, hard hat and safety harnesses.  Tools and equipment used include;
> chain falls, pendants, shackles, beam clamps, plate clamps, rigging bars, dollys,
> cat dollys, capstons, lashing.

Prior to that position, Hutton's submitted résumé indicates that Hutton worked as a "Rigger

Limited" at the Puget Sound Naval Shipyard from 1982 to 1989.  Hutton's submitted résumé

describes his job duties in that position as follows:

> Performed and directed placement, removal, and repositioning of machinery and structural members of ships, submarines, buildings, heavy equipment, and other loads, working in all aspects of ship/submarine dry-docking and repair. Performed rigging loft assignments; machine shop rigging; submarine and surface craft rigging, nuclear and non-nuclear rigging, general shop rigging and special projects.

> Comprehensive knowledge of hoisting gear, cranes, hand signals, rope splicing, knot tying, wire rope, and assorted rigging ear and tools. Determined correct rigging path in movement of loads. Calculated weights of loads in order to decide rigging gear and equipment required to perform job safely. Qualified for lead handling, respirator, and forklift. Read and interpreted job requests, drawings, diagrams, and technical instructions to determine most effective, appropriate, and safe method of accomplishing project.

> Selected rigging gear, estimated weights, laid out jobs, obtained crane service as needed to remove, install, relocate and otherwise handle large structural parts on Naval vessels, to include aircraft carriers, other surface craft and submarines. Used turnbuckles as lash-tightening devices in securing objects, wire rope clamps to form eyes at ends of wire rope to lash loads and used nylon slings in cases where wire rope would damage load. Used finger lifts of pallet jacks to raise pallets and pallet slings to handle pallets. Used deck winches, often in pairs, to hoist large volumes of material and equipment, and air or electric hoists mounted to overhead for same purpose. Used jacks and jackstands to raise and support loads when overhead could not be used. Used lashing rings to drift loads, chainstops to hold back and exert pull on wire rope, and grommets to hang loads on large or "T" shaped crane hooks. Used grip hoists in horizontal testing of pendants and working gear, dynometers and load cells to measure large weights to prevent overloading crane, and test weights to test cranes. Interpreted blueprints, work requests, test documents and other technical references to establish and verify correct rigging procedures. Operated pendant control cranes up to 10 tons and worked with Bridge Crane Operators in nuclear refueling houses.

Under the heading "Licenses and Qualifications," Hutton's submitted résumé indicates in part as

follows:

> Forklift Operator License, Category 2, 3 and 4 (03/12/1985); Operate forklifts up to 20,000 lbs.; Category 2 Crane Operator License (03/15/2008); Operate Pendant Control Crane up to 80,000 lbs.; Category 1 and 2 Crane Operator (02/15/1988); Operate Pendant Control Crane up to 10,000 lbs . ; Aerial Work Platform 90'

Page 50 - FINDINGS AND RECOMMENDATION

Straight Boom (11/09 / 2004) ; Qualified up to 90' Straight Boom.

Under the heading "Training," Hutton's submitted résumé indicates in part as follows:

> Rigger in Charge Cat 1 Cranes; Crane Signaling and Communication; Crane Safety Course Overhead; Crane Signaling and Track Switching; Crane Signaler Verification; Crane Walker; SPS Category 2 and Category 3 Crane Operator; Basic Rigger 2A12-3 and Category 2 Crane Operator

Hutton was approximately age 54 at the time the hiring decision was made.

### i.    ADEA Disparate Treatment Claim, Count Five

On the basis of Hutton's age, approximately six years younger than Cramblett, defendant argues that Cramblett has not successfully stated, and cannot successfully state, a *prima facie* ADEA disparate treatment claim in connection with the hiring decision to fill the third McNary Dam rigger posision, because successful candidate Hutton was not "substantially younger" than Cramblett.  I agree with the defendant that Hutton was not substantially younger than Cramblett, and that Cramblett therefore cannot set out a *prima facie* claim of ADEA disparate treatment in connection with Hutton's selection.  *See Diaz*, 521 F.3d  at 1209.  Moreover, Cramblett cannot set out a *prima facie* claim for the independent reason that Hutton's qualifications for the rigger position appear on the face of the two candidates' submitted résumés to be superior to Cramblett's.  *See*, *e.g.*, *Bergene*, 272 F.3d at 1140.  The fact that Prewitt's initial selection for the position was Rich rather than Hutton is immaterial, because the selection of Hutton after Rich declined the position is sufficient to establish the inaccuracy of the theory that, but for age-discriminatory animus, Cramblett would have been the candidate selected.

Even on the inaccurate *arguendo* assumption that Cramblett had successfully set out a *prima facie* ADEA disparate treatment claim in connection with the hiring process that resulted

in Hutton's selection, I agree with the defendant that Cramblett cannot establish that the proffered

reason for Hutton's selection is pretextual.  Cramblett identifies discriminatory animus in

connection with several elements of the selection process.  First, Cramblett argues that

discriminatory animus may be inferred from that fact that Prewitt rated Cramblett's "ability to get

along with others" significantly lower in connection with the third McNary Dam hiring decision

than he did in connection with either of the two previous McNary Dam hiring decisions.  This

argument is wholly unpersuasive, in that analysis of the relevant ratings establishes that Prewitt's

ratings of all candidates' "ability to get along with others" were significantly lower in connection

with the third McNary Dam hiring decision than in connection with the previous decisions.  The

reduction was not limited to Cramblett or to older job candidates in general.

Second, Cramblett argues that  discriminatory animus may be inferred from Freels' sworn

testimony that she was unaware of Cramblett's EEOC charge at the time she rated him, given that

Freels had received contemporaneous email messages noting the fact that Cramblett had filed

such a charge.  Again, the argument is unpersuasive, because other raters conceded their

awareness of the pending charge, suggesting that defendant was not motivated to intentionally

conceal the raters' awareness of the charge, and because knowledge that a job candidate has filed

a complaint is logically discrete from the question of age-discriminatory animus.

Third, Cramblett argues that  discriminatory animus may be inferred from the close

similarity between Freels' and Prewitt's ratings.  However, even if Cramblett is correct that Freels'

ratings were not independently derived, but rather largely followed Prewitt's, that fact is

insufficient to establish Freels' or Prewitt's animus against Cramblett.  The more parsimonious

explanation for the similarity is that Freels lacked sufficient experience with the skills required

for a rigging position to generate her own, independent ratings.  If Freels was not the optimal

choice to serve on the selection panel, that fact is likewise insufficient to establish that the panel

was tainted with bias.  That conclusion appears particularly strong where, as here, the proffered

reason for the successful candidate's selection is his superior qualifications for the position, and

where the successful candidate's qualifications appear to be superior to the complaining

unsuccessful candidates' qualifications by a wide and significant margin.

Because a finder of fact could not reasonably conclude on the basis of the evidence of

record that Hutton's selection was motivated by age-discriminatory animus, defendant's motion

should be granted as to count five of Cramblett's ADEA disparate treatment claim.

### ii.      ADEA Retaliation Claim, Count Two

By contrast, defendant assumes for purposes of its motion that Cramblett has stated a

*prima facie* ADEA retaliation claim in connection with the third McNary Dam hiring decision,

but takes the position that Cramblett cannot show that its proffered reason for selecting Hutton

over Cramblett was pretextual, on the ground that the two candidates' résumés effectively speak

for themselves to establish that Flowers had superior rigger qualifications to Cramblett.  For the

reasons discussed above, I agree with the defendant that Cramblett has not successfully raised

any material question of fact as to the pretextual nature of defendant's proffered

nondiscriminatory explanation;  as defendant asserts, Hutton's qualifications for the position are,

on the face of the submitted résumés, superior to Cramblett's by a wide and significant margin.

In consequence, defendant's motion should likewise be granted as to count two of Cramblett's

ADEA retaliation claim.

Page 53 - FINDINGS AND RECOMMENDATION

e.      **Hiring Decision in Connection with The Dalles Dam Rigger Position (Damm):  ADEA Disparate Treatment Claim, Count Six; ADEA Retaliation Claim, Count Three**

According to the vacancy announcement of February 2009, the Corps was looking for a

rigger for The Dalles Dam to perform the following duties:

> Performs rigging in the installation, maintenance and overhaul of components of hydroelectric dam structures, which may include locks, spillway, powerhouse, fishways and appurtenances.  Analyzes rigging requirements and prepares supplies of slings and chokers; determines proper method for fastening slings, hitching on loads, clamping cables and tying ropes to objects.  Interprets structural drawings; plans layout for steel structures; perfonns necessary burning; fabric tes and constructs crane booms, steel platfonns, fish traps and movable steel trucks for moving bulky and heavy items.  Performs maintenance on steel structures, such as powerhouse switch ing structures, gantry cranes, derricks, mitre gates, stairways, grillage, tainter valves, etc.

The vacancy announcements indicated that the following qualifications were required for

the position:

> •      Applicants' work histories must demonstrate the following Knowledges, Skills, and Abilities:  Ability to plan, layout, assemble and install rigging to move heavy loads in confined areas during unit overhauls without the aid of cranes using multipoint suspension techniques where exact placement of the load is critical to the success of installation as well as the safety of workers in the area.  Knowledge and skill to use and understand standard hand signals to direct movement of load both manually and with a crane.  Knowledge of safety practices, critical loads, etc. and ability to calculate rigging requirements for all situations related to powerhouse lifts.  Ability to cut, splice, and fit all types of rigging equipment to assure safety and timeliness of movement.  Ability to read and understand blueprints to develop patterns, plan, layout, fabricate, construct and install steel and sheetmetal structural members and equipment accessories which have combined straight and curved edges and shapes.  Skill with cutting, burning and welding equipment sufficient to fabricate and install completed items.  Ability to operate a variety of electrically·powered drills, saws, and pneumatic tools.  As occasion demands, operates electrically-powered cranes from 7 ½ to 350+ ton capacity.  PHYSICAL EFFORT:  Work requires heavy physical effort, including prolonged periods of standing, climbing ladders, and working in cramped spaces.

Must be able to lift and carry equipment and materials weighing frequently up to, and occasionally over 45 pounds.  Must be able to see with limited visibility as when using welding masks, and have normal depth perception. WORKING CONDITIONS:  Work is performed both inside and outside the powerhouse.  Indoor work subjects employee to high noise levels and outdoor work is subject to usual climate extremes.  There is danger of cuts, bruises, and bums from equipment operated and falling from ladders and scaffolds.  Employee is subject to the discomfort of wearing required safety equipment such as hard-hats, welding masks or shields, gloves, safety glasses and goggles, safety shoes, respirators and ear plugs as required.  Employee is exposed to welding fumes, acids and solvents normal to the trade.  There is the added danger of drowning when working around swift moving water.  Must wear appropriate safety equipment and protective clothing, and successfully complete and maintain all occupational health requirements.  CONDITIONS OF EMPLOYMENT: Must possess or be able to obtain and maintain NWD Crane Operator Class U Certification.  May occasionally operate hoisting equipment such as tuggers, manlifts, and shop, bridge, and gantry cranes.  A valid state drivers license is required.

- Experience and training that furnish the knowledges, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade. Ability to use and maintain appropriate tools and equipment. Ability to read, understand, and apply instruction and other materials related to the job.

- Ability to do the work of the position under normal supervision.

- Work requires standing, stooping, bending, climbing, crawling, and kneeling for extended periods in uncomfortable positions,  Worker may lift and move materials weighing up to 40 pounds and, occasionally heavier items with assistance.

- Experience and training that provide the knowledge, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade.

- Possess and maintain the physical ability to lift and carry up to 45 pounds.

  * * *

- Demonstrated work experience that equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the

> duties of the position, and that is typically in or related to the work of the
> position to be filled.

Thus, welding is an important component of the rigger's duties at The Dalles.

In support of his application for this position, Cramblett submitted a résumé identical to the résumé he submitted in support of his application for the third McNary Dam rigger position, discussed in detail *supra*. Cramblett was 60 years old at the time the hiring decision was made.

The résumé that successful candidate Damm submitted for the rigger position announced at The Dalles in February 2009 indicates that at the time he applied for the position he was working as a rigger at the Strategic Weapons Facility Pacific Northwest, and had been doing so for approximately three years. Damm's submitted résumé sets forth his job duties in that position as follows:

> Perform on-loading and off-loading of weapons (missiles. warheads, torpedoes, and associated components) aboard US Navy Trident Class nuclear submarines. Select rigging gear to be used and estimate sizes and weights of equipment. Comprehensive knowledge of and hands-on experience using tools of Rigger trade. Assist in manufacture of various types of wires, pendants, and fiber rope items. Splice wire ropes and other synthetic rope assemblies. Qualified signalman for bridge, mobile , portal. and derrick-type floating cranes. Licensed to operate electric, diesel, and gas-powered forklifts. man lifts, and scissor lifts. . . .

> Working independently, plan, layout, assemble, repair, and install complex weight handling gear. Calculate weight estimates. center of gravity and weight distribution to determine stress factors/angle computations and plan weight distribution and load maneuvering. Brace, cushion. and prepare loads. Maneuver, tilt, and control loads by tag lines and riggings. Determine means of moving heavy ordnance through narrow openings and in confined spaces. Estimate sizes, weights, and equipment capabilities. plan for clearances and safety factors. Plan, layout, assemble and install rigging to move loads in confined areas during unit overhauls without aid of cranes, using multipoint suspension techniques where exact placement of load was critical to success of installation and safety of workers in area. Direct operation of cranes. Work aloft as necessary.

Page 56 - FINDINGS AND RECOMMENDATION

Estimate weight of objects using math formulas.  Use knowledge of trade theory
and up-to-date work practices to implement alternate methods while
accomplishing jobs safely, on schedule and in cost effective manner.  Use, test,
and perform necessary documentation of weight handling equipment within
specifications and guidelines of technical directives.  Read, interpret and apply
instructions, references, procedures, blueprints and shop sketches as they applied
to rigging/staging procedures .  Maintain comprehensive knowledge of and
hands-on experience in application of Quality Assurance and Hazardous Materials
requirements.

Comprehensive knowledge of safe working load limits of rigging gear.
Experienced in use of chafing gear to protect loads from possible damage and in
safe operation of rigging and material movement.  Work on-board floating
vessels, rig components to and through doors, hatches, and hull cuts.

Damm's submitted résumé further indicates that Damm previously worked as a rigger at the

Puget Sound Naval Shipyard from 1989 to 1994 and again from 2005 to 2006.  The résumé

indicates that Damm's job duties in that position "duplicated" the rigger duties of the SWFPN

position.  In addition, Damm worked as a welder from 1995 through 1997 at Northland

Fabrication, and as a welder at Island Tug and Barge from 1994 to 1997.  Damm's submitted

résumé lists among his "Current Qualifications" the following:  "HOIST INSTALLATION,

REMOVAL, EXPLOSIVES HANDLER (TM); . . . EXPLOSIVES FORKLIFT OPERATOR

LICENSE; PHYSICAL CLIMBER/RIGGER; . . . PHYSICAL FORKLIFT; . . . NUCLEAR

WEAPONS RIGGER (TM)."   Damm was approximately age 47 at the time the hiring decision

was made.

### i.    ADEA Disparate Treatment Claim, Count Six

Defendant assumes for purposes of its motion that Cramblett has stated a prima facie

ADEA disparate treatment claim in connection with the hiring decision to fill The Dalles Dam

rigger position, but argues that Cramblett cannot show that its proffered reason for selecting

Damm over Cramblett was pretextual, on the ground that the two candidates' résumés effectively speak for themselves to establish that Damm had superior rigger qualifications to Cramblett.

Cramblett takes the contrary position, arguing first that he was the superior candidate due to his purportedly superior rigging and welding skills.  While it appears highly likely from the face of the two submitted résumés that Cramblett had significantly greater welding experience than Damm, it is evident from the text of the vacancy announcement of February 2009 that the Corps was looking for the best qualified rigger candidate who possessed sufficiently advanced welding skills, and Damm's submitted résumé establishes that Damm's welding skills were sufficient.  Damm's submitted résumé moreover indicates that Damm's rigging experience was significantly greater than Cramblett's, Cramblett's contrary contention notwithstanding.

In addition, Cramblett argues that discriminatory animus may be inferred from the purported fact that, in addition to Damm, two other job candidates were hired to work as riggers at The Dalles from the "referral list" generated in connection with the vacancy announcement of February 2009, notwithstanding the fact that Cramblett had been selected as first alternate for the position after Damm.  However, defendant offers evidence tending to establish that the hires other than Damm were selected from a different referral list, one generated in connection with a vacancy in connection with which Cramblett did not file an application.  As a rule, where there is a dispute of material fact, the dispute is to be resolved in favor of the non-moving party, in this case Cramblett, but here Cramblett has not offered evidence sufficient to support the conclusion that he was passed over in favor of lower-ranked applicants for the same job position, and therefore has not established the existence of any such dispute.

For the foregoing reasons, Cramblett's arguments fall short of establishing that

defendant's explanation that it hired the most qualified job candidate is pretextual.  Nothing about the process by which Damm was selected would support an inference of age-discriminatory animus.  Defendant's motion should therefore be granted as to count six of Cramblett's ADEA disparate treatment claim.

### ii.    ADEA Retaliation Claim, Count Three

Defendant contests whether Cramblett has successfully made out a *prima facie* ADEA retaliation claim in connection with its failure to select Cramblett to fill The Dalles Dam rigger position, offering evidence that no selecting official was aware of Cramblett's EEO filing at the time the hiring decision was made.  Cramblett offers no direct evidence that any selecting official was aware of his EEO charge, but argues that discriminatory animus and causation may be inferred from the purported hires from the The Dalles referral list discussed above.  In addition, Cramblett argues that discriminatory animus may be inferred from Cramblett's supervisor Bobnick's testimony that he provided Kunigel with a "good" reference for Cramblett, testimony which Cramblett finds less than credible in light of the position Cramblett has taken, that Bobnick was "shutting him out" and harassing him in the workplace at approximately this same time.  Cramblett similarly urges the court to infer discriminatory animus from Williams' contact with Kunigel at approximately the same time, contact which it is Cramblett's position would have given Williams an opportunity to poison Kunigel against Cramblett's candidacy.

Assuming *arguendo* that Cramblett has successfully stated a *prima facie* retaliation claim in connection with the hiring decision to fill The Dalles Dam rigger position, for the same reasons adduced immediately above, Cramblett has not offered evidence sufficient to create a question of fact as to whether defendant's proffered nondiscriminatory reason for its hiring

decision was pretextual.  On the face of the two candidates' submitted résumés, Damm's

qualifications for the rigger position are superior to Cramblett's.  In consequence, defendant's

motion should be granted as to count three of Cramblett's ADEA retaliation claim.

> **f.      Hiring Decision in Connection with The Dalles Dam Welder
> Position (Worthington):  ADEA Disparate Treatment Claim,
> Count Seven; ADEA Retaliation Claim, Count Four**

According to the vacancy announcement of May 2009, the Corps was looking for a

welder for The Dalles Dam to perform the following duties:

> Work is performed in support of a hydroelectric power plant facility.  Incumbent
> is responsible for using accepted trade methods, a variety of welding procedures,
> and laying out own work to accomplish safe welding requirements.  Performs
> electric-arc and oxy-acetylene welding, brazing, silver-soldering, and flame
> cutting in connection with welding structural members, high pressure tanks,
> piping, and valves requiring hydrostatic tests after welding.  Welds angles,
> channels, sheet metal, and plates of iron, steel, aluminum, brass, bronze, stainless
> steel, and other metals and alloys.  Plans and lays out work from blueprints,
> sketches, and oral instructions; does horizontal, vertical, and overhead welding; at
> times, welds in close quarters such as turbine pit and gate sections, or performs
> high scaffold welding on navigation locks and spillway gates.

The vacancy announcements indicated that the following qualifications were required for

the position:

> •      Specialized Experience: Knowledge and skill as a full performance
> journey level welder.  Knowledge of a wide range of various welding
> methods.  Skill in using a variety of welding processes to weld all types of
> commonly used metals and alloys of various sizes, shapes, and thickness.
> Sk ll in brazing and silver soldering.  Skill in devising special jigs,
> fixtures, and shields.  Skill in blueprint reading and technical layout.
> PHYSICAL EFFORT:  The work involves standing, walking, stooping,
> bending, kneeling, climbing, and crawling.  Work may be done in
> awkward and cramped positions such as when welding in hard-to-reach
> places.  Physical effort requires lifting, carrying, pushing, pulling, and
> twisting objects frequently weighing 45 pounds, and occasionally
> weighing more than 45 pounds in setting up work, equipment, and in
> completing assignments.  WORKING CONDITIONS :  The work is done

indoors and outdoors, sometimes in bad weather, in areas that may vary from "clean rooms" to areas that are noisy, dirty, and smoky.  Welding involves exposure to fumes, infrared and ultraviolet radiation, heat, flying sparks, the glare of torches and heated materials, the possibility of eye injury, electrical shock, burns, broken bones, and the chance of cuts when working with sharp objects.  There is discomfort when wearing protective clothing, gloves, and flash shield or eye goggles.  Other hazardous work locations are on bridge cranes and gantry cranes, spillway and intake slots, tainter valve shafts, and on the navigation lock.  Must wear appropriate safety equipment and clothing, and successfully complete all occupational health requirements.

•     Experience and training that furnish the knowledges, skills, and abilities needed to perform the duties of this position consistent with accepted practices of the trade. Ability to use and maintain appropriate tools and equipment. Ability to read, understand, and apply instruction and other materials related to the job.

•     Ability to do the work of the position under normal supervision.

•     Possess and maintain the physical ability to lift and carry up to 45+ pounds.

       * * *

•     Demonstrated work experience that equipped the applicant with the particular knowledge, skills, and abilities to successfully perform the duties of the position, and that is typically in or related to the work of the position to be filled.

Not expressly listed among the requirements for the job – although perhaps subsumed within the

job requirements for "Knowledge and skill as a full performance journey level welder" and

"Knowledge of a wide range of various welding methods" – is skill in a form of precision

welding called tungsten inert gas, or TIG welding.  Defendant nevertheless offers evidence that

ability to perform TIG welding was an important requirement for the welder position at The

Dalles.

      According to the résumé Cramblett submitted in support of his application for the

Page 61 - FINDINGS AND RECOMMENDATION

position, which was identical to the résumé he submitted in support of his application for the third McNary Dam rigger position, discussed in detail *supra*, Cramblett had substantial, extensive experience as a welder.  However, when he was interviewed for the position, Cramblett advised Rich that he hadn't done any TIG welding for some time, because other welders at the Moorings did those jobs due to Cramblett's hand tremor.  Cramblett may have indicated that the tremor was no longer a significant impairment by the time he was interviewed, but apparently did concede that he would need some practice to bring his TIG welding skills up to a high level. Cramblett was age 60 at the time the hiring decision was made.

The résumé that successful candidate Worthington submitted for the welder position announced at The Dalles in May 2009 indicates that he had eleven years of experience as a journeyman boilermaker and welder.  Apparently he also gave a good interview, indicating great confidence in his own skills.  Worthington was approximately age 38 at the time the hiring decision was made.

### i.      ADEA Disparate Treatment Claim, Count Seven

I agree with Cramblett that he has stated a *prima facie* ADEA disparate treatment claim in connection with the hiring decision to fill The Dalles Dam welder position.  Cramblett was older than 40 when the decision was made, he was qualified but not hired for the welder position, and instead a job candidate more than ten years younger whose qualifications were not superior to Cramblett's was selected.  This is sufficient to state a *prima facie* claim.  *See Bergene*, 272 F.3d at 1140.

Defendant explains its selection of Worthington by the assertion that it hired the most qualified candidate for the job, without regard to the candidates' ages.  However, Cramblett has

Page 62 - FINDINGS AND RECOMMENDATION

met his burden to create a material fact as to whether that proffered explanation could be pretextual. Specifically, Cramblett adduces evidence tending to establish that Darrell Hunt, the person with authority to act on the selecting official's recommendation for the position, specifically advised selecting official Kunigel that, after Scott, the best-qualified candidate for the position was Cramblett. This evidence raises the question whether the decision to begin the selection process anew after Scott declined the position, rather than simply offer the position to the next most qualified candidate, might have been motivated by discriminatory animus against Cramblett. In addition, Cramblett expressly denies having discussed his hand tremor with selecting official Rich, creating a question of fact as to whether defendant's proffered grounds for rejecting Cramblett's candidacy was pretextual rather than genuine.

Perhaps more troubling is defendant's reliance on Cramblett's purported difficulties with TIG welding as grounds for rejecting Cramblett's application. As noted above, TIG welding is not listed as a skill requisite to the advertised position. If an ability to perform proficient TIG welding is in fact an indispensable skill for a welder at The Dalles, defendant has not explained why the vacancy announcement failed to so specify. This failure likewise raises a question of fact as to the pretextual nature of defendant's proffered explanation.

Because Cramblett has met his burden to produce evidence calling into question defendant's proffered explanation for its decision to hire Worthington for the welder position at The Dalles Dam, defendant's motion should be denied as to count seven of Cramblett's ADEA disparate treatment claim.

### ii.    ADEA Retaliation Claim, Count Four

Defendant contests whether Cramblett can make out a *prima facie* ADEA retaliation

claim in connection with the decision to fill The Dalles Dam welder position. Specifically, defendant offers evidence tending to establish that none of the selecting officials involved in the selection of Worthington were aware of Cramblett's EEO charge at the time the selection was made. Cramblett offers no evidence to the contrary.

In the absence of evidence that the selecting officials who favored Worthington's application for the welder position at The Dalles Dam over Cramblett's had actual awareness that Cramblett had filed an EEO charge, the record does not support the conclusion that the adverse hiring decision was motivated by retaliatory animus. In consequence, defendant is correct that Cramblett has not successfully stated a *prima facie* ADEA retaliation claim in connection with Worthington's selection. Defendant's motion should therefore be granted in connection with count four of Cramblett's ADEA retaliation claim.

### 2.    Cramblett's ADEA Retaliatory Harassment Claim

By and through his fourth claim for relief (Cramblett's "ADEA retaliatory harassment claim"), Cramblett alleges defendant's liability under the ADEA for harassment in retaliation for Cramblett's decision to file an EEOC complaint. In support of his ADEA retaliatory harassment claim, Cramblett offers evidence that his managerial supervisors instructed at least one of his co-workers to the effect that being observed in conversation with Cramblett was sufficient grounds for an employee to be labeled as a potential trouble-maker. Based on this evidence, Cramblett argues that ostracism by his co-workers following his filing of the EEOC charge, where no such ostracism was evident prior to the filing date, was caused by management's retaliatory animus

against him.[4]  In addition, Cramblett offers evidence that Bobnick issued disparate discipline

against Cramblett for minor safety infractions that other workers were permitted to get away

with, and routinely gave Cramblett undesirable work assignments.  Cramblett argues that such

conduct, which did not occur prior to the date he filed his EEOC charge, was motivated by

retaliatory animus.

A finder of fact could conclude on the basis of this evidence that prior to the date he filed

his EEO charge, Cramblett was a valued employee who received stellar performance reviews and

was popular among his co-workers, and that after he filed his EEO charge he began receiving

negative evaluations and baseless or disparately imposed discipline for minor infractions, and

became subject to ostracism by co-workers due to management intervention.  A finder of fact

could further reasonably conclude that such workplace treatment would have deterred a

reasonable employee from filing an EEOC complaint.  In consequence, defendant is not entitled

to judgment as a matter of law in connection with Cramblett's ADEA retaliatory harassment

claim, and defendant's motion should be denied to the extent filed against that claim.

### B.    Title VII Claims

As noted above, two of Cramblett's five claims arise under Title VII.  Title VII makes it

unlawful for an employer "to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race

[or] color. . . ."  42 U.S.C. § 2000e-2(a)(1).  "The protection against employment discrimination

---

[4]  While defendant disputes whether the ostracism Cramblett testifies to having
experienced in the workplace began after, as opposed to before, the date Cramblett filed his
EEOC charge, I resolve this dispute in Cramblett's favor for purposes of resolving the merits of
defendant's summary judgment motion.

Page 65 - FINDINGS AND RECOMMENDATION

provided by Title VII applies to civilian employees of the military, through 42 U.S.C. §

2000e-16(a)." *Mier v. Owens*, 57 F.3d 747, 749 (9th Cir. 1995), *citing Gonzalez v. Dept. of

Army*, 718 F.2d 926, 928 (9th Cir. 1983).  Although "Title VII does not protect military

personnel," *id.*, *citing Gonzalez*, 718 F.2d at 928, employees who serve in a dual military/civilian

capacity are subject to the protections of Title VII except where an employee challenges a

personnel action "integrally related to the military's unique structure," *id.* at 751.

        To prevail on a Title VII hostile workplace claim premised on racial animus, a plaintiff

must show:  "(1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2)

that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to

alter the conditions of the plaintiff's employment and create an abusive work environment."

*Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998), *citing Fuller v. City of Oakland*, 47

F.3d 1522, 1527 (9th Cir. 1995).  "The more outrageous the conduct, the less frequent[ly] must it

occur to make a workplace hostile."  *Id.*, *citing Ellison v. Brady*, 924 F.2d 872, 878 (9th Cir.

1991).  "To determine whether conduct was sufficiently severe or pervasive to violate Title VII,

[the courts must] look at all the circumstances, including the frequency of the discriminatory

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*Vasquez v. County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003) (internal quotation marks

omitted), *quoting Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001).  "In addition,

the working environment must both subjectively and objectively be perceived as abusive."  *Id.*

(internal quotation marks omitted), *quoting Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th

Cir. 2000).

Page 66 - FINDINGS AND RECOMMENDATION

In addition, it is an unlawful practice under Title VII:

for an employer to discriminate against any of his employees or applicants for employment, . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a). As under the ADEA, to prove retaliation under Title VII, an employee must establish that "(1) ][he was engaging in protected activity, (2) the employer subjected h[im] to [retaliatory conduct], and (3) there was a causal link between the protected activity and the employer's action." *Bergene v. Salt River Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001), *citing Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 755 (9th Cir. 1997). Also as under the ADEA, for retaliatory conduct to be actionable under Title VII, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (citation, internal quotation marks omitted).

### 1. Cramblett's Title VII Hostile Work Environment Claim

By and through his third claim for relief (Cramblett's "Title VII hostile work environment claim"), Cramblett alleges defendant's liability under Title VII for maintaining a hostile work environment due to Cramblett's race. As evidence that defendant maintained a hostile work environment, Cramblett points to the same evidence he relies upon in support of his ADEA retaliatory harassment claim: evidence of managerial intervention calculated to cause ostracism in the workplace, evidence that Cramblett was given undesirable work assignments, and evidence of disparate discipline. As evidence that such workplace treatment was racially motivated,

Cramblett relies upon the tension Williams experienced in connection with the incident in which Williams understood Cramblett to have mentioned his son-in-law's race in an effort to ingratiate himself with Williams.

Without addressing the question whether all of the complained-of conduct considered together could constitute a hostile work environment, I agree with defendant that the evidentiary record does not permit the finding that the ostracism, bad work assignments, or disparate discipline that Cramblett experienced were motivated by racial animus. There is no evidence that, other than Williams, any of the persons through whom the putative racial animus was communicated were of a different racial background from Cramblett, or that any of them harbored any racial antipathy toward Cramblett, either because of Cramblett's race or because of his son-in-law's. Indeed, the record contains only speculation that even Williams might have harbored any racial animus toward Cramblett. In the absence of evidence that objectionable behavior is racial in nature, a Title VII hostile work environment claim will not lie to the extent premised on race. *See*, *e.g.*, *Vasquez*, 349 F.3d at 642, 642-43.

Because Cramblett has not offered evidence sufficient to create a question of fact as to whether the defendant's complained-of conduct was conduct of a racial nature, defendant's motion should be granted as to Cramblett's Title VII hostile work environment claim.

### 2.    Cramblett's Title VII Retaliation Claim

By and through his fifth claim for relief, Cramblett alleges defendant's liability under Title VII for harassment in retaliation for having complained about the hostile work environment that is the subject of Cramblett's third claim for relief. In support of this claim, Cramblett relies upon the same evidence that supports his ADEA retaliatory harassment claim and Title VII

hostile work environment claim: evidence of managerial intervention calculated to cause ostracism in the workplace, evidence that Cramblett was given undesirable work assignments, and evidence of disparate discipline. In connection with his Title VII retaliation claim, Cramblett takes the position that the complained-of conduct was motivated by a retaliatory animus caused by Cramblett's February 2009 complaint regarding Williams.

The evidence does not support Cramblett's theory of Title VII retaliation. First, Cramblett testified that the complained-of conduct began immediately after Cramblett filed his October 2008 EEOC charge, and it is not logically coherent to take the position that the February 2009 complaint could have caused conduct that took place before the complaint was filed. Second, while the February 2009 complaint made reference to race, it was not in any material sense a complaint regarding race discrimination or any other conduct made actionable under Title VII. The matter of the complaint was limited to Williams' use of his interaction with Cramblett (without using Cramblett's name) for illustrative purposes at the Portland Army Recruiting Battalion EEO class.

Because the conduct purportedly giving rise, on Cramblett's Title VII retaliation theory, to retaliatory animus against Cramblett was neither in opposition to nor a complaint regarding conduct prohibited under Title VII, any resulting retaliatory conduct could not as a matter of law have been actionable under Title VII. Moreover, because the complained-of retaliatory conduct largely preceded the event alleged to have caused it, Cramblett's theory of causation necessarily fails. In consequence, defendant's motion should be granted as to Cramblett's Title VII retaliation claim.

Page 69 - FINDINGS AND RECOMMENDATION

## CONCLUSION

For the reasons set forth above, defendant's motion (#51) for summary judgment should be granted as to counts one, two, four, five, and six of Cramblett's ADEA disparate treatment claim (Cramblett's first enumerated claim for relief), as to all counts of Cramblett's ADEA retaliation claim (Cramblett's second enumerated claim for relief), as to Cramblett's Title VII hostile work environment claim (Cramblett's third enumerated claim for relief), and as to Cramblett's Title VII retaliation claim (Cramblett's fifth enumerated claim for relief), and denied as to count seven of Cramblett's ADEA disparate treatment claim and as to Cramblett's ADA retaliatory harassment claim (Cramblett's fourth enumerated claim for relief).  Also for reasons set forth above, defendant's motion (#82) to strike the opinion testimony of Cramblett's expert witness Terry Armentrout should be granted.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge.  Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation.  If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

Dated this 19th day of November, 2012.

/s/ Paul Papak
Honorable Paul Papak
United States Magistrate Judge