IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JON CRAMBLETT,

          Plaintiff,

                                  3:10-CV-54-PK

v.                                   FINDINGS OF FACT AND
                                   CONCLUSIONS OF LAW

JOHN McHUGH,

          Defendant.

PAPAK, Magistrate Judge:

      Plaintiff Jon Cramblett filed this action against defendant John McHugh, Secretary of the

Army, on January 15, 2010.  As discussed in greater detail below, at the time he filed this action,

Cramblett was employed as a welder at the U.S.  Moorings in Portland, Oregon, by the U.S.

Army Corps of Engineers, Northwestern Division (the "Corps"), and had been so employed since

approximately October or November 2005, when he was approximately 56 years old.  Prior to

filing his complaint, Cramblett had applied for numerous better-paying jobs working for the

Corps as a welder or rigger on dam projects, without success.  Cramblett amended his complaint

on December 9, 2010.

      By and through his amended complaint, Cramblett alleged defendant's liability for age

discrimination in violation of the Age Discrimination in Employment Act of 1967 (the "ADEA"),

for retaliation in violation of the ADEA, for maintaining a hostile, racially discriminatory work

Page 1 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

environment in violation of Title VII of the Civil Rights Act of 1964, for retaliatory harassment

in violation of the ADEA, and for retaliation in violation of Title VII, each such claim arising out

of six occasions on which the Corps denied Cramblett's applications for better-paying jobs, and

instead hired younger applicants to fill the vacancies at issue.

On November 19, 2012, I recommended that defendant be granted summary judgment as

to all of Cramblett's claims other than (i) his ADEA disparate treatment claim to the extent

premised on the Corps' hiring decision in connection with a welder vacancy announced in May

2009 at the The Dalles Dam, and (ii) his ADEA retaliatory harassment claim, which is premised

on the Corps' alleged harassment of Cramblett in retaliation for his October 2008 decision to file

an EEOC complaint regarding the Corps' repeated failures to hire him. On March 8, 2013, Judge

Brown adopted that recommendation without modification. As of March 14, 2013, all parties

consented to magistrate jurisdiction.

Effective June 29, 2013, Cramblett resigned from employment by the Corps.

Prior to Cramblett's resignation, in March and April 2013 – apparently in contemplation

of Cramblett's pending decision to resign – the parties had discussed the possibility that

Cramblett would amend his complaint a second time, to add a claim of constructive discharge

arising out of his resignation. On April 23, 2013, I directed Cramblett to file his second amended

complaint by August 2, 2013, and directed the parties to complete discovery related to the

contemplated constructive discharge claim by September 30, 2013. On July 1, 2013, however,

just two days after the effective date of Cramblett's retirement, Cramblett advised defendant and

the court that he had elected not to amend his complaint or to add a claim for constructive

discharge, and that his remaining claims could therefore be immediately set for bench trial (no

Page 2 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

party having requested trial by jury).

In consequence, this action went to bench trial on March 4, 5, 6, 7, and 20, 2014, in connection with Cramblett's ADEA retaliatory harassment claim and ADEA disparate treatment claim to the extent premised on the Corps' hiring decision to fill the The Dalles Dam welder vacancy announced in May 2009. I have considered the trial testimony, oral argument on behalf of the parties, and all of the evidence of record. My findings of fact and conclusions of law are as follows.

## FINDINGS OF FACT

1.    The U.S. Moorings ("the Moorings") is a shipyard on the Willamette River in Portland Oregon operated by the Portland District of the Corps. The primary purpose of the Moorings is to support two Corps dredge ships that operate along the west coast. The Moorings is staffed by a welding team composed of three to five welders.

2.    Plaintiff Jon Cramblett ("Cramblett") was hired by the Corps as a welder at the Moorings in November 2005. Cramblett was 56 years old when he was hired by the Corps. At all material times, Cramblett was a certified shielded metal arc welder (unlimited, all positions) and flux-cored arc welder (unlimited, all positions), as well as a journeyman rigger and certified overhead crane operator. In addition, at all material times Cramblett was a veteran qualifying for 10-point veterans' preference eligibility under 5 U.S.C. § 2108. At all material times during Cramblett's tenure at the Moorings, the working foreman of the welding team Cramblett was part of was Charles Bobnick, whose job responsibilities included tracking and approving leave and work hours, provision of work assignments to members of the weld team, and enforcing compliance with applicable

safety procedures in the workplace. The next higher manager in Cramblett's reporting
structure was the Yard Superintendent, a position filled on a rotating basis by the working
foremen in the trade and craft shops at the Moorings until early 2009, when Guy Vetere
was appointed to the position. The next and highest level manager in Cramblett's
reporting structure was Mac Robison, the Corps' Chief of Plant Maintenance for the
Portland District.

3.      Although Cramblett accepted the position at the Moorings, his goal was to work at one of
the Corps's hydroelectric dams on the Columbia River. The jobs at the dams pay
significantly more than the jobs at the Moorings. For this reason, Corps employees often
move from the Moorings to jobs at the dams. Cramblett applied for a number of
positions at the dams prior to and after he was hired at the Moorings, but was not selected
for any of these positions. It was widely known at the Moorings that Cramblett hoped to
be hired for a position at one of the dams, and Cramblett widely shared his
disappointment in repeatedly failing to be selected for such a position.

4.      By early 2007, Cramblett believed that he had not been selected for a position at one of
the hydroelectric dams because of his age, and he shared this theory frequently and at
length with his co-workers in the weld shop at the Moorings. Cramblett had a son-in-law,
David Proctor, who worked for the Corps in the same building as LaMar Williams, the
Equal Employment Opportunity (EEO) Manger for the Portland District of the Corps. On
February 15, 2007, Proctor sent an email to Williams on behalf of Cramblett. Proctor
stated in the email as follows:

        Mr. LaMar I understand that you are the E.O. Rep for the Corps of

Engineers Portland Branch. Jon Cramblett is employed by the Corps and feels he's been discriminated against for his age. He's wondering if you could guide him in the right direction as far as who he may need to talk to? Could Jon call you sometime today or tomorrow? His contact number is 503-665-1696.

(Ex. 6.)

Proctor did not explain his relationship to Cramblett in the email to Williams. Williams emailed Proctor and Cramblett back about setting up a meeting but the meeting never occurred. Williams did not work with Cramblett or Proctor and had not met either one of them at this time.

5.  Later in 2007, Williams met Cramblett while Williams was at the Moorings to teach an EEO workshop. Cramblett told Williams he was having trouble getting hired for a position at the dams and asked Williams if he could find out more information about the selection process. At the end of the conversation, Cramblett mentioned that he had a black son-in-law. Cramblett (who is Caucasian) assumed that Williams (who is African-American) knew that Proctor was Cramblett's son-in-law and that Williams knew that he worked in the same building as Proctor. Therefore, in Cramblett's mind the comment was contextually appropriate in that he thought he was helping Williams identify his son-in-law. However, Williams did not understand Cramblett's reasons for making the remark, and perceived it as a socially awkward attempt by Cramblett to ingratiate himself with Williams. A few weeks later, Cramblett called Williams to follow up on their conversation and to request the identities of the persons ultimately selected for the positions Cramblett had applied for. Cramblett perceived Williams as annoyed by the call, and as hostile to Cramblett.

6.    Williams and Cramblett had several email exchanges over the next year and a half in
which Cramblett would ask for information about various selections at the dams and
Williams would attempt to obtain the requested information.  Cramblett never asked
Williams whether he could file an EEO Complaint about his non-selections and Williams
never notified Cramblett about his right to do so.  Cramblett did take EEO training during
this time period which included information about his right to file an EEO complaint.  At
one point, Williams referred Cramblett to James Richards, the Corps' EEO officer for the
Walla Walla District regarding his theory of age discrimination in connection with
Cramblett's non-selection for jobs in that district.  Richards advised Cramblett to remove
from his resume certain items from which his age could easily be inferred, but Cramblett
did not take this advice.  Like Williams, Richards did not notify Cramblett of his right to
file an EEO complaint.

7.    In or around December 2007, Cramblett filed a grievance through his union regarding
alleged age discrimination in connection with his non-selection for a position at one of
the dams.  In September 2008, the union determined that the grievance system was an
inappropriate mechanism for resolving a claim of age discrimination in hiring, and
referred Cramblett to his EEO office.  Rather than working through his EEO office, on
October 1, 2008, Cramblett filed an informal complaint of age discrimination with the
Corps regarding his non-selection for positions at the dams, relying on the services of an
attorney.  (Ex.  10.)  Williams became aware of this complaint in October 2008 by virtue
of his position with the Corps.  Williams referred the complaint to Mary Bretz, an EEO
specialist reporting to him.  Bretz conducted an investigation of Cramblett's claims,

Page 6 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

including his allegations that Williams and Richards improperly failed to advise him of his EEO rights.

8.    On November 7, 2008, Williams was at the Moorings to teach an EEO class to supervisory employees. Prior to his class, Williams went to the Bobnick's office and asked if two employees he knew were present in the workplace. When Williams learned they were not there, he asked to see Cramblett. Bobnick escorted Williams to where Cramblett was working in the weld shop. Cramblett did not recognize Williams from their earlier meeting, so Williams reintroduced himself. Cramblett was initially taken aback after he learned it was Williams since he had just recently filed an EEO complaint. Williams apologized to Cramblett for not being able to help him with his concerns about his inability to get a job at the dams. Cramblett then raised his contention that age discrimination was the reason he had not obtained a job at the dams. At that point, Williams told Cramblett that they needed to stop talking because Cramblett was represented by an attorney in connection with that matter. Cramblett said he would not tell his attorney about the conversation, but Williams said that to the contrary he should do so. Williams nevertheless elected to continue the conversation and stated that he did not believe Cramblett's work performance was a reason he was not getting hired. Cramblett mistook this as a criticism of his work performance, and asked Bobnick (who had remained for the conversation) about his performance. Bobnick then made complimentary statements about Cramblett's performance and dedication to work. Williams then suggested the possibility that Cramblett was not presenting himself well when he applied for the jobs. Williams knew that Cramblett had gone uninvited to one

dam for an informational interview and Williams was concerned about Cramblett's

interpersonal skills.  As an example, Williams made reference to Cramblett's previous

statement to him about the fact that he had a black son-in-law.  Williams then had to

leave to give the training.  The conversation did not involve raised voices and lasted

approximately five minutes.  Williams never spoke to Cramblett again after that day and

their only subsequent interactions were in the context of Cramblett's litigation regarding

Williams's conduct.  Williams later conceded that his approach of Cramblett in the

workplace following Cramblett's EEO complaint was "probably inappropriate[]."

9.    Later that day, Bobnick thanked Williams for speaking to Cramblett.  Williams

interpreted Bobnick's appreciation to mean that Bobnick agreed with Williams's

statements to Cramblett and that Bobnick had not previously expressed these thoughts to

Cramblett.

10.    On November 14, 2008, the Portland Army Recruiting Battalion conducted a day of

training at the Skamania Lodge resort in Stevenson, WA.  The Portland Army Recruiting

Battalion is an Army unit that received EEO support from the Corps.  Williams gave a 90

minute EEO class as part of the training.  During the class, Williams stated that it was

important for managers to use good judgment and to be frank with their employees.

Williams gave the example of an employee who had made an awkward comment about

having a black son-in-law and the employee's supervisor thanking Williams for talking to

the employee.  This anecdotal example was discussed for a period of approximately five

minutes.  Williams did not mention Cramblett or any other individuals by name, and

made no direct reference to the Moorings.  Unbeknownst to Williams, Cramblett's

Page 8 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

daughter Melissa Cramblett ("Melissa") was one of the 20 attendees of the class. Cramblett had told Melissa about his interactions with Williams, so she realized that Williams was referring to her father.

11.    Later that night, Melissa called her father and told him about the example that Williams used in the class.

12.    Cramblett was a Vietnam veteran who had lived with a number of medical conditions that arose from his military service. Among these conditions were post-traumatic stress disorder ("PTSD") and a tremor in his hands. One traumatic ordeal that Cramblett experienced in Vietnam was the suicide of one of his fellow soldiers, a teenager named Junior. In Cramblett's recollection, Junior's suicide was due in part to an overbearing lieutenant. Cramblett's PTSD symptoms had worsened in 2006. (Ex. 540.)

13.    Cramblett's PTSD symptoms worsened still further in November 2008 after Cramblett learned of Williams' anecdote to the Skamania Lodge training class, and he began suffering flashbacks to the suicide of Junior, likening Williams to the overbearing lieutenant and himself to Junior. Cramblett began consulting with Linda Rotering, PhD., in connection with his worsened PTSD and related symptoms, including depression, anxiety, and sleep disorder.

14.    As Cramblett's daughter Melissa observed, Cramblett's demeanor underwent a dramatic change after he learned about the Skamania Lodge incident, from which he never recovered during the tenure of his employment at the Moorings. Cramblett became depressed and withdrawn, and felt alienated from his co-workers and management at the Moorings. Cramblett's depression affected his interactions in the workplace. His

co-workers felt his personality had developed a "roller-coaster" aspect that made it difficult to interact with him. These symptoms manifested in his job at the Moorings in a variety of ways. Cramblett mentioned to his coworkers on more than one occasion that he had contemplated suicide. In 2011, he mentioned that something that had occurred at work had almost made him "go postal."

15. Cramblett's co-workers and supervisors dealt with his mood swings as best they could. When Cramblett's statements revealed suicidal ideation, his co-workers promptly reported it to supervisors who, in turn, reached out to the Corps's Employee Assistance Program ("EAP") for guidance. (Ex. 521, 522.) Likewise, when Cramblett made the "go postal" comment, his supervisors ensured that he was receiving appropriate medical care and verified that none of his co-workers felt threatened in the workplace.

16. Cramblett's co-workers also supported him in dealing with the hand tremor that Cramblett had suffered since his military service in Vietnam. Cramblett could do most welding assignment even with the tremor; however, tungsten inert gas ("TIG") welding was difficult for him to perform because in TIG welding the welder can only use one hand on the welding torch while the other hand is used to feed filler material into the weld pool. Bobnick ensured that other welders on the team performed the TIG welding, so that Cramblett was not required to do so. Cramblett's co-workers also helped out when the tremor affected Cramblett's other welding assignments. On one occasion, Cramblett and a co-worker, Darold Wheeler, were on assignment in Astoria when Cramblett's hand tremor prevented him from finishing a welding job. Wheeler stepped in and completed the assignment for Cramblett without complaint.

Page 10 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

17.  Cramblett's co-workers and supervisors dealt with him as best they could on more
     mundane day to day matters as well.  Cramblett was in general an extrovert, but his
     emotional difficulties during this period would from time to time cause him to withdraw
     from social interactions.  Cramblett's co-workers would often just follow Cramblett's lead
     and refrain from initiating interaction with him when he was not his typical outgoing self.
     On at least some occasions, Cramblett misinterpreted his co-workers' failure to initiate
     interactions with him as ostracism.  In addition to avoiding social interactions with
     Cramblett when his demeanor indicated that he was not amenable to them, most of
     Cramblett's co-workers also avoided prolonged conversation with Cramblett when he was
     interested in discussing the progress of his claims against the Corps, which occurred with
     regularity (to the point that Cramblett was known for introducing himself to new co-
     workers by telling them about his lawsuit).  On at least some occasions, Cramblett
     interpreted his co-workers' reluctance to discuss the lawsuit as additional evidence of
     ostracism.

18.  Following the Skamania Lodge incident, Cramblett additionally developed the habit of
     refraining from offering advice to co-workers when he observed them performing tasks in
     an unsafe or otherwise suboptimal manner, if his advice was not expressly solicited.

19.  Cramblett's supervisors took reasonable steps to try to resolve Cramblett's expressed
     concerns regarding the workplace social environment.  In April 2009, Cramblett met with
     his first-line rating supervisor, shipyard superintendent Guy Vetere, for his annual
     performance appraisal.  Cramblett mentioned that he felt Bobnick was singling him out in
     workplace issues and that his co-workers were ostracizing him.  Vetere then met with his

own supervisor, Mac Robison, to determine how to deal with this issue. After receiving input from the Corps's Seattle District EEO Office, Robison and Vetere met with each of Cramblett's co-workers individually to notify them of Cramblett's concerns and to be sure that they understood that such conduct should not occur. Robison and Vetere dealt with this delicate matter in a judicious manner. They did not indicate to Cramblett's co-workers that they had determined that the alleged harassment occurred, nor did they indicate that any individual employee (such as Bobnick) had been identified by Cramblett as engaging in the alleged harassment. This approach struck a balance between preventing any harassing conduct, yet not going so far as to create any resentment or other attitudes that might actually spur such conduct.

20. Cramblett's supervisors did not instruct or encourage Cramblett's co-workers to ostracize him. The only evidence presented to support Cramblett's contention that they did so was the testimony of David Pitman, a crane operator on the yard shop team. On one occasion, Pitman's team leader, Larry Garnett, told Pitman to limit the amount of time he spent with Cramblett and to keep his interactions with Cramblett job-related. However, Garnett credibly testified that his direction was in response to his concern that Pitman regularly spent excessive amounts of time in conversation with Cramblett – conversations in excess of half an hour – when there were tasks at hand requiring his attention. Garnett was motivated to keep his subordinate employee Pitman focused on his job duties rather than to ostracize Cramblett.

21. As welding team leader, one of Bobnick's duties was to enforce Corps safety rules. In 2009, the Corps expanded the safety protocols that applied to the welding team based on

Page 12 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

the welding team's exposure to hexavalent chromium. (Ex. 530, 531.) Hexavalent chromium is a particulate that can pose health risks to individuals with exposure in elevated levels. The safety rules that Bobnick enforced included the requirement of wearing fall protection in areas where a dangerous fall was possible, changing coveralls daily, and prohibiting food and drink in the weld shop.

22.  Bobnick counseled all of the welding team members about non-compliance with various safety rules. Bobnick counseled Cramblett about safety issues during the entirety of Cramblett's tenure at the Moorings. Bobnick had to counsel Cramblett more frequently about these issues than some of his co-workers in the months following the implementation of new safety rules because Cramblett had more difficulty adapting to and following the new policies. Despite Cramblett's resistance to following safety rules, his chain of command never took any action against him beyond informal verbal admonishment. On one occasion, the Corps's management employee relations ("MER") section at district headquarters advised that a written letter of instruction was appropriate in response to one safety-rule violation, but Cramblett's chain of command decided to provide Cramblett with only a detailed verbal admonishment. (Ex. 524.)

23.  Cramblett's actions in response to his belief that he was being singled out for safety violations contributed to the difficulties in his relationship with his co-workers. After being verbally admonished about his safety infractions, Cramblett began to surreptitiously take pictures of his co-workers doing work in a manner that he felt also constituted safety violations. When his co-workers found out about this, they were upset and complained about it to Vetere. Vetere verbally counseled Cramblett about the inappropriate

picture-taking as well as several other issues, such as having open beverages in the weld shop and spending excessive time on the office computer for personal matters.

24.    The Dalles Dam is a hydroelectric dam on the Columbia River operated by the Portland District of the Corps.  The Dalles Dam is staffed with a maintenance section that includes a structural crew composed of a crew supervisor, a working foreman, riggers, welders, crane operators, and a utility worker.  Until 2013, the structural crew only included one welder position.

25.    The most common types of welding processes used at The Dalles Dam are stick welding and metal inert gas ("MIG") welding.  Stick welding is an electric arc welding process that uses a consumable electrode to lay the weld.  MIG welding is an electric arc welding process in which a continuous and consumable wire electrode and a shielding gas are fed through a welding gun.

26.    Tungsten inert gas ("TIG") welding is another type of electric arc welding process used at The Dalles Dam.  In TIG welding, a tungsten electrode torch is used to heat the metal and create a weld pool.  A filler material is introduced by hand to the weld pool to complete the weld.  TIG welding provides greater control over the weld pool than stick or MIG welding, allowing for stronger, higher quality welds.  However, TIG welding is difficult to perform because the welder has to maintain a short arc length and slowly feed a filler metal into the weld area with one hand while manipulating the welding torch in the other. (Stick and MIG welding do not require the welder to manually feed filler metal into the weld area.)  The Dalles Dam has a TIG welding machine.

27.    TIG welding is not a substantial percentage of the welding done at The Dalles Dam, but

Page 14 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

when it is performed it is because a decision has been made (at times by engineers) that a stronger weld is necessary for functional or safety reasons. For that reason, when TIG welding is performed, it is important that the job be done well. Only the welder on the structural crew is expected to perform TIG welding (unlike other forms of welding which are commonly performed by non-certified employees such as riggers). So it is necessary for the person filling the welder position at The Dalles Dam to be able to perform TIG welding.

28.    Prior to May 2009, the welder at The Dalles Dam, Roger Allen, notified his supervisors that he would be retiring soon. The Corps decided to hire a welder to fill Allen's position before Allen retired, so that there would be a transition time where Allen could show the new welder the duties of the welder position before Allen retired.

29.    The Corps accepted applications for the welder position at The Dalles Dam in May 2009. (Ex. 502.) The vacancy announcement for the position stated that the duties of the position involved responsibility for performing "a variety of welding procedures", including "electric-arc welding and oxy-acetylene welding, brazing, silver-soldering, and flame cutting." (Ex. 502.)

30.    Cramblett applied for the welder vacancy at The Dalles Dam.

31.    The structural crew supervisor, Arthur Kunigel, was the Corps official assigned to select a candidate to fill the May 2009 welder vacancy. Kunigel and Darrell Hunt, the head of the maintenance section, reviewed the resumes of the candidates for the welder position. Based on their "preliminary screening" of the resumes of the candidates for the position, Kunigel and Hunt ranked Robert Scott as the top candidate and Cramblett as the second

Page 15 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

candidate. (Ex. 46, Ex. 80.)

32.    Kunigel did not conduct interviews of any candidates for the welder position, and the only reference check he did was one reference check of Scott. (Ex. 80.)

33.    Kunigel selected Scott for the welder position. Scott turned 53 years old in July 2009.

34.    The selection paperwork submitted by management officials at The Dalles Dam to Cathy Penn, the Corps Human Resources official handling the selection, identified Scott as the selectee for the position, but did not identify any alternates. Kunigel left The Dalles Dam about two weeks after he made the selection for a long term deployment to Afghanistan with the Corps.

35.    Scott declined the offer of the welder position on July 27, 2009. (Ex. 504.)

36.    Following Scott's decision to decline the position, Penn asked management officials at The Dalles Dam if they had an alternate for the position. (Ex. 504.) This request was necessary because no alternate had been identified in the selection paperwork. However, even under circumstances in which an alternate was identified, it was Penn's practice to confirm with management that they would like to extend an offer to the alternate identified on the paperwork rather than to do so automatically.

37.    Because of Kunigel's deployment, the structural crew foreman, Stephen Rich, was the temporary crew supervisor at the time Scott declined the welder position. Hunt asked Rich to look through the files in the structural crew office to see if Kunigel had identified an alternate. Rich could not find any documents about the selection. Hunt then asked Rich to review the resumes and select another candidate to fill the position.

38.    Rich reviewed the resumes of all of the candidates for the welder position. After

reviewing the resumes, Rich narrowed the candidate pool down to seven candidates.

Rich then requested that the Corps' Human Resources office verify the eligibility and

qualifications of the seven candidates.  Six of the seven candidates were considered

eligible and qualified.

39.    After further review of the resumes, Rich narrowed the finalists for the position to four

candidates:  Jon Cramblett, David Crawford, Tyler Crubaugh, and Kevin Worthington.

40.    The resumes of Cramblett and Worthington reflect about the same amount of time in

welding positions.  Worthington had about 11 years of experience as a

boilermaker-welder from 1995-2006.  Cramblett also had about 11 years of experience as

a welder, from 1994-1997 and from 2001-2009.  Cramblett did not do any welding during

his career as a heavy equipment operator at Reynolds Aluminum from 1974-1994 and

1997-2000.

41.    Although Worthington's resume was not as detailed as other candidates', Rich was

impressed that Worthington had been certified as a nuclear welder and had worked in

mines and confined spaces, which suggested he was highly skilled.

42.    Rich spoke with current or former supervisors and received good reports of all four

remaining applicants, including a good report on Cramblett from Bobnick.

43.    Rich then interviewed the four candidates.  Rich took notes of these interviews on the

candidates' resumes and on a typed interview worksheet he had prepared in advance that

included questions for the candidates.  (Ex.  509.)

44.    The substance of Rich's interview of Cramblett is largely undisputed and is included in

Rich's written summary of the interview.  Cramblett discussed his welding experience,

including welding he had done in confined spaces on barges in Alaska and his extensive experience in stick welding. When Rich asked about TIG welding, Cramblett acknowledged that he was "rusty" or weak in TIG welding because other welders on his crew performed TIG welding. Cramblett said he would be willing and able to build his TIG skills if needed.

45.    Rich testified that Cramblett explained that the reason he did not do TIG welding at the Moorings was because of a nervous condition in his hands. Cramblett denies making this statement. Although not necessary for purposes of resolving this claim, I find Rich's testimony is more persuasive and that this statement was more likely than not made during the interview. Rich's testimony on this point is more credible than Cramblett's for several reasons. First, Rich was a generally credible witness. Second, Cramblett has acknowledged that his memory can be faulty. Third, the statement is factually accurate – Cramblett was not performing TIG welding because of a tremor in his hands. The evidence suggests no reason for Rich to have falsely attributed Cramblett as the source of this information.

46.    Rich did not ask Cramblett any questions during the interview about his age or about any topics that could be construed as a proxy for age.

47.    Two of the other finalists for the welder position, Crawford and Worthington, expressed confidence in their interviews that they possessed all of the skills needed to fill the position. At this point, Rich selected Crawford and Worthington for a second interview, and Rich eliminated Cramblett from consideration for the position.

48.    Rich eliminated Cramblett from consideration for the position because of Cramblett's

Page 18 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

acknowledged weakness in TIG welding.

49.   Rich asked the project manager at The Dalles Dam, Ron Twiner, to join him for a second phone interview of the final two candidates because Twiner had greater experience in welding than Rich. In the second interview, Worthington showed great confidence in his skills and also answered technical questions well. He also had a variety of heavy industrial welding experience. He sent one of his former welding certifications and said he had access to several others if needed. After discussing the skills and abilities of the two finalists with Twiner and Hunt, Rich selected Worthington, with Crawford as the first alternate and Cramblett as the second alternate. Twiner and Hunt both concurred with this decision.

50.   Prior to his selection of Worthington, Rich had hired a 53 year old as a crane operator and a 56 year old as a rigger.

51.   In December 2012, Cramblett applied for retirement from the Corps, effective June 29, 2013. Cramblett did not select an earlier retirement date because he had heard it took several months for the Corps to process a retirement application. No specific workplace incident occurred in the four months prior to Cramblett's application for retirement that caused him to apply for retirement.

52.   One other issue which Cramblett's supervisors counseled him about was the impact of his frequent absences from work on the welding team's mission. Cramblett missed work frequently for medical appointments (such as bi-weekly appointments with his psychologist) and non-medical reasons (such as to retrieve mail). Cramblett's supervisors encouraged him to schedule appointments on Fridays, since that was a day off at the

Moorings.  Cramblett did not do so, despite the fact that his counselor was available to

see him on Fridays.  (Ex. 69.) Cramblett also acknowledged that from December 2012

until his retirement in June 2013 he drained his sick leave balance down to almost zero

because he could not cash in sick leave at retirement.  These absences were particularly

detrimental to the welding team's mission because the welding crew works substantial

overtime in the winter and early spring (often seven days a week) to complete work

before the dredges are required to leave the Moorings in the late spring.

53.    Cramblett retired from the Corps on June 29, 2013.  On his last day at work, Cramblett

received a retirement party from his co-workers that he acknowledged was nice.  Bobnick

found a Youtube video of Cramblett dancing (which was a recreational hobby of

Cramblett's) that he played at the party to everyone's enjoyment.  Cramblett is receiving

his full retirement pension from the Corps.  He has had trouble making ends meet,

though, and has considered trying to get rehired at the Moorings.

## CONCLUSIONS OF LAW

I.    **Cramblett's Age Discrimination in Employment Act ("ADEA") claim premised on non-selection for welder position at The Dalles Dam (enumerated in Cramblett's First Amended Complaint as Claim 1, Count 7).**

1.    Cramblett takes the position that he was not selected for the welder position at The Dalles

Dam due to his age.  (FAC ¶¶ 169-176.)  The Age Discrimination in Employment Act

("ADEA") prohibits age discrimination in personnel actions taken by the federal

government.  29 U.S.C.  § 633a(a).  Cramblett has the burden of proving by the

preponderance of the evidence that his age was the "but-for" cause of his non-selection

for the welder position at The Dalles Dam in 2009.  *See Gross v. FBL Fin. Servs., Inc.,*

557 U.S. 167, 176 (2009) ("To establish a disparate-treatment claim under the plain

language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause

of the employer's adverse decision."). Citing a decision by the D.C. Circuit Court of

Appeals, Cramblett argues that the appropriate causation standard for age discrimination

claims involving the federal government under 29 U.S.C. § 633a(a) is the so-called

"substantial factor" test rather than the "but for'" standard. *See Ford v. Mabus*, 629 F.3d

198 (D.C. Cir. 2010). However, the Ninth Circuit has made clear that the but-for

standard applies even in federal sector age discrimination cases. *See Shelley v. Geren*,

666 F.3d 599 (9th Cir. 2012) ("To prevail on a claim for age discrimination under the

ADEA, a plaintiff must prove at trial that age was the "but-for" cause of the employer's

adverse action.") (*citing Gross*, 557 U.S. at 175-77); *see also Ford*, 629 F.3d at 208

(Henderson, J. concurring) ("Given its flat declaration that the mixed-motives theory 'is

never proper in an ADEA case' and its criticism of the burden-shifting framework set

forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268

(1989), [] it is difficult for me to conclude the [Supreme] Court would endorse the

reading we announce today." (*citing Gross*, 129 S.Ct. at 2346)).

2.    Cramblett has failed to meet his burden to show that age was the "but-for" cause of his

nonselection for the welder position. The evidence shows that the management official

(Rich) who eliminated Cramblett from consideration for the position did so for the

legitimate reason that Cramblett had an acknowledged weakness in TIG welding. It is

undisputed that Cramblett had this weakness, and I have found that he acknowledged the

weakness in his interview with Rich.

3.    Cramblett claims that this reason is pretextual because TIG welding is not performed

frequently at The Dalles Dam.  This argument is unavailing for two different reasons.

    a.    First, the frequency with which TIG welding is performed is not conclusive as to

the importance of the work, nor does it suggest that using it as a basis for a

selection is illegitimate.  A TIG weld is a very strong weld, so it is commonly

used for assignments in which a welding failure would present a greater risk.

Second, because it is a less common weld, it is less likely that non-welders at The

Dalles Dam (such as riggers) would be able to perform TIG welding.  Thus, it is

important that the sole welder at The Dalles Dam be able to perform TIG welding

to standard.  The fact that The Dalles Dam has a TIG welding machine and that

the previous welders could perform TIG welding also demonstrates the

importance of the skill at that workplace.  Finally, the fact that Rich felt strongly

enough about TIG welding skills that he included a question about that issue on

the typed interview sheets he prepared also indicates the importance of the skill.

(Ex. 509.)

    b.    Second, regardless of the importance of TIG welding, Cramblett presents no

evidence that age discrimination is the real motive for his non-selection.  Rich did

not take any action during the selection process that could reasonably be

considered as indicative of age bias. Moreover, to conclude that Rich's emphasis

on TIG welding was pretextual, it would be necessary first to conclude that Rich

learned in advance of the interviews that Cramblett was weak in TIG welding and

then inserted questions regarded TIG into the interview questionnaire he relied on

Page 22 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

in interviewing each of the candidates in order to mask the age-discriminatory animus he planned to indulge.  No evidence presented at trial tended to support such fanciful speculation.  In fact, Rich's typed questionnaires constitute evidence that the concern regarding skill in TIG welding was not a manufactured pretext for age discrimination.

4.      Cramblett also contends that age discrimination is demonstrated by Kunigel's testimony that Cramblett was his second choice for the welder position behind the original selectee, Scott. This argument is likewise unavailing.

a.      First, the record indicates that Cramblett was likely a preliminary second choice based solely on a resume review, and that Kunigel never took the steps to formally make Cramblett an alternate for the position (such as conducting an interview and a reference check).  The most direct evidence on this point is that Cramblett's name was not submitted by management at The Dalles Dam to the HR section of the Corps.  But this conclusion is also supported by Kunigel's admission that he never interviewed or did any reference checks on Cramblett, and by Hunt's email statement that Cramblett was a second choice based on "preliminary screening" of the resumes that would require "further inquiry."  (Ex. 46.)  Given this evidence, the more comprehensive selection process conducted by Rich appears to constitute the appropriate conclusion of the initial selection process begun by Kunigel.  Rich also viewed Cramblett as a highly qualified candidate based on his resume, but the additional step of an interview revealed information that was not gleanable from the simple resume review that Kunigel had performed during the

initial selection process.

b.      Second, the evidence presented at trial does not support an inference that age

discrimination was the reason Cramblett did not get the position. In other words,

on the *arguendo* assumption that Kunigel had decided to make Cramblett the

formal alternate selectee for the welder position in the initial selection process,

there is no evidence that it was age discrimination rather than administrative

oversight that caused him not to get the position after the first selectee declined

the position. If, in fact, Cramblett was Kunigel's alternate selection, the absence

of any alternate listed on the selection paperwork suggests administrative error

rather than age discrimination. Moreover, it is not coherent to suggest that the

Corps could have intended to name Cramblett as the alternate selectee while

simultaneously harboring the intent not to select him under any circumstances due

to his age. Finally, the age of the initial selectee for the position – 53 years old –

tends to foreclose any reasonable inference that age could have been a factor

motivating the Corps to refuse to consider Cramblett as the alternate selectee.

5.    Even if Cramblett were correct that the appropriate causation standard to apply to this

claim is the "substantial factor" test, for the foregoing reasons I would reach the same

conclusion and the same disposition of Cramblett's ADEA disparate treatment claim.

6.    Because I conclude that age discrimination was not the reason Cramblett was not selected

for the welder position, there is no need for me to consider Cramblett's damages-related

argument that his retirement was a constructive discharge. If I were to reach this issue, I

would find that Cramblett has failed to meet his burden to show that "working conditions

deteriorate[d], as a result of discrimination, to the point that they bec[a]me sufficiently

extraordinary and egregious to overcome the normal motivation of a competent, diligent,

and reasonable employee to remain on the job to earn a livelihood and to serve his or her

employer.'" *Poland*, 494 F.3d at 1184 (quoting *Brooks,* 229 F.3d at 930 (9th Cir. 2000)).

**II.    Cramblett's ADEA Retaliation Claim (enumerated in Cramblett's First Amended Complaint as Claim 4)**

7.    The Age Discrimination in Employment Act prohibits federal employers from retaliating

against employees for filing complaint of age discrimination. *Gomez-Perez v. Potter*, 553

U.S. 474, 491 (2008). In his fourth claim for relief, Cramblett claims that he experienced

harassment from his co-workers at the Moorings and from Williams in retaliation for

having made complaints of age discrimination and that such harassment collectively

created a hostile work environment. (FAC ¶¶ 219-229.) In order to establish a retaliatory

hostile work environment, the plaintiff must prove each of the following elements by a

preponderance of the evidence:

a.    he was subjected to verbal comments or physical contact or intimidation in

retaliation for having made complaints of age discrimination;

b.    the conduct was unwelcome;

c.    the conduct was sufficiently severe or pervasive to alter the conditions of his

employment and create a retaliatory abusive or hostile work environment;

d.    he perceived the working environment to be abusive or hostile; and

e.    a reasonable person in his circumstances would consider the working environment

to be abusive or hostile.

Page 25 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

*See Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000); *Hardage v. CBS*

*Broadcasting, Inc.*, 427 F.3d 1177, 1189 (9th Cir. 2005) *see also Hashimoto v. Dalton*,

118 F.3d 671, 675 n.1 (9th Cir.1997) ("[T]he ADEA anti-retaliation provision is 'parallel

to the anti-retaliation provision contained in Title VII,' . . . 'cases interpreting the latter

provision are frequently relied upon in interpreting the former.'" (quoting *Passer v. Am.*

*Chem. Soc.*, 935 F.2d 322, 330 (D.C. Cir.1991))).

8.    Although not pled in his first amended complaint, Cramblett asserted at trial that the

conduct by Williams in November 2008 constituted actionable retaliation in itself, and

not as part of a harassment or hostile work environment theory. To establish retaliation

under the ADEA, a plaintiff must prove (1) he engaged in a protected activity; (2) he

suffered an adverse employment action; and (3) there was a causal connection between

the protected activity and the adverse employment action. *Poland v. Chertoff*, 494 F.3d

1174, 1179-80 (9th Cir. 2007). An employment action is adverse if it "might have

dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

9.    For several reasons, the alleged conduct by Cramblett's co-workers and supervisors does

not constitute retaliation or retaliatory harassment. First, there is no causal connection

between Cramblett's EEO activity and the conduct of his colleagues at the Moorings.

Cramblett's coworkers and supervisors had no ties to the managers who were the subject

of Cramblett's age discrimination complaints regarding his non-selections at the dams

(other than being employed by the same federal agency). The lack of retaliatory motive is

also indicated by the fact that much of the conduct at issue -- such as the scrutiny of

Page 26 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

Cramblett's work – occurred long before Cramblett ever filed an EEO complaint.

Moreover, most of the alleged harassing conduct was motivated by legitimate reasons.

This includes the counseling of Cramblett for safety infractions, for taking pictures of his

co-workers, and for excessive absences.  The evidence also shows that Cramblett's

co-workers were not ostracizing him, but were actually doing their best to interact with

him when his behavior was quite erratic and unpredictable.

10.    Likewise, the conduct of Williams toward Cramblett in November 2008 also does not

constitute actionable retaliation or retaliatory harassment.  Williams showed questionable

judgment in deciding to talk with Cramblett at the Moorings and then using his

experience with Cramblett as an example in his training class at Skamania Lodge.

Nevertheless, the evidence does not support the conclusion that Williams' actions were

taken to retaliate against Cramblett for filing an EEO complaint.  In addition, Williams'

conduct does not rise to the level of actionable retaliation, in that it was not so severe or

pervasive as to alter the terms or conditions of Cramblett's employment.

a.    On the issue of retaliatory intent, Cramblett argues that Williams's conduct

constitutes "retaliation per se" because he expressed a negative opinion to

Cramblett regarding the merit of his EEO Complaint.  But there is no legal

support for the proposition that any expression of skepticism by an employer

about the merits of an employee's EEO Complaint constitutes retaliation.

Cramblett cites *Pruette v. Postal Service*, EEOC Appeal No.  01951567, 1998 WL

133446 (E.E.O.C.)  in support of this argument.  In *Pruette*, a Postal Service EEO

counselor informed an employee who complained of sexual harassment that

"Whorish people will be treated in a whorish manner," and that if "there was even one more complaint against her for any reason, disciplinary action would be immediate and severe." *Id.* at *2. The EEOC found that this conduct "constituted a *per se* violation of the Commission's regulations prohibiting restraint and interference with the EEO process." As an initial matter, *Pruette* is not highly persuasive authority because it is an administrative decision that has not been cited even once by a federal court in 16 years. Moreover, regardless of the merits of the *Pruette* decision, Williams's conduct is distinguishable from the conduct of the EEO counselor in *Pruette.* First, unlike the counselor in *Pruette*, Williams did not direct abusive language at Cramblett, nor did he threaten Cramblett with discipline. Rather, Williams cited an example of an event that long-predated Cramblett's EEO complaint (the "black son-in-law comment") as an example of a reason that Cramblett's failure to get a job at a dam may be due to reasons other than age discrimination. Both the substance of Williams's comments and the manner in which he presented them indicate that Williams was not trying to get back at Cramblett for filing an EEO complaint, but was rather simply discussing the underlying merits of Cramblett's EEO Complaint. Most notably, Williams did not state or even suggest that Cramblett could suffer any negative repercussions in his employment from having initiated the EEO process. While Williams would have been better served to not engage in this discussion with Cramblett, the fact that he did does not demonstrate retaliatory intent. Likewise, the class that Cramblett gave at Skamania Lodge does not provide any

evidence of retaliatory intent. Most notably, Williams's statements in the class were not directed at Cramblett, nor did Williams intend for Cramblett to ever become aware of his statements. Furthermore, Williams's statements in the class do not indicate any animus toward Cramblett for filing an EEO complaint. Rather, Williams's statements again were about what Williams perceived as a separate issue that existed, *i.e.*, a failure by Cramblett's supervisors to be frank with him.

b.    In any event, even if Williams's actions in November 2008 were motivated by retaliatory intent, they would not rise to the level of actionable retaliation. On several occasions, the Ninth Circuit has held that negative remarks by a supervisor to an employee about an EEO complaint do not constitute retaliation. *Hardage*, 427 F.3d at 1189 (holding that a supervisor's snide remarks and threats do not constitute actionable retaliation); *Kortan v. California Youth Authority,* 217 F.3d 1104, 1112 (9th Cir.2000) (holding that a supervisor's laughing and stating that the plaintiff "got him on sexual harassment charges," the supervisor's hostile stares, and increased criticism were insufficient to constitute retaliation); *see also Casey v. Mabus*, 878 F. 2d 17. (even the use of harsh words by a supervisor on a single, isolated occasion does not amount to a materially adverse action when it is not repeated and when it is not followed by any other ramifications or negative action taken against the employee because it would not dissuade a reasonable employee from supporting a claim of discrimination). Both the content and the manner of Williams's discussion with Cramblett – no threats, no yelling and only

Page 29 - FINDINGS OF FACT AND CONCLUSIONS OF LAW

holding the conversation on one occasion – makes Williams's conduct even less hostile or abusive than the conduct in these Ninth Circuit cases. Furthermore, the fact that Williams was not a supervisor of Cramblett and did not have any control over Cramblett's day to day work or his work evaluations also indicates that the conduct was not actionable retaliation. While Cramblett may have subjectively felt that Williams's conduct created a retaliatory hostile work environment, the standard is an objective one. A reasonable person in Cramblett's position would not have felt that his working conditions had become abusive or hostile based on Williams's conversation at the Moorings in November 2008, nor was the conduct sufficiently severe or pervasive to alter the conditions of Cramblett's employment.

For the foregoing reasons, defendant is entitled to judgment in his favor on each of Cramblett's remaining claims. A final judgment will therefore be prepared.

Dated this 19th day of May, 2014.

Honorable Paul Papak
United States Magistrate Judge